[No. 30661. Department Two. December 31, 1948.]

MICHIGAN MILLERS MUTUAL FIRE INSURANCE COMPANY, *Respondent* v. OREGON-WASHINGTON RAILROAD AND NAVIGATION COMPANY *et al., Defendants,* GREAT NORTHERN RAILWAY COMPANY, *Appellant.*[1]

[1]Reported in 201 P. (2d) 207.

*A. J. Clynch, Clark A. Eckart,* and *Harry T. Davenport,* for appellant.

*Cashatt & Turner* and *Jerome Williams,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment rendered against appellant, Great Northern Railway Company, for damages resulting from a fire.

In the city of Garfield, the tracks of the Oregon-Washington Railroad and Navigation Company and its operating lessee, Union Pacific Railroad Company, run in a general easterly and westerly direction. Adjacent to the tracks, to the north, and on the railroad right of way, is situated the warehouse of the White Mill, Inc. The Great Northern tracks run parallel to and south of the Union Pacific tracks, a distance of a little over one hundred feet. Between the tracks flows Silver creek. The creek meanders between the two tracks, sometimes running close to the Union Pacific tracks, and sometimes close to the Great Northern tracks. The nearest point from the south bank of the creek to the mill is thirty-eight feet. As a result of the meandering of the creek, at times it is north of the line dividing the rights of way of the railroads, and at times it is south.

For some time prior to October 19, 1946, in the area between the two tracks, grass and weeds had been permitted to reach a height of about three feet, and willows in the creek had reached a height of six or eight feet. As early as July, complaints had been registered by the city authorities with the railroad companies concerning this condition, and their section crews then had mowed the grass, and had cut the willows and had laid them on the respective banks of the creek.

The two section crews met at Garfield at about nine o'clock on the morning of October 19th. Each crew consisted of a foreman and two men. Mr. Swanda, Union Pacific section foreman, testified that he had intended to burn at the eastern end of his section, but that he was flagged down by Mr. Raugust, Great Northern section foreman. Raugust testified:

"Q. Where did you meet him? A. Well, just as he came in, you know, I walked over, you know, and as I approached he says: 'Are you ready for us?' So according to that he must have had some instructions to clean up. Q. Had you had instructions to clean up? A. Yes. ' To clean that up and clean it out. Q. By cleaning out, just what do you mean? A. Well, chop the brush out and get rid of them; you know burn it up, stuff, clean out."

Swanda testified:

"A. He asked me if I would help—if we could burn in there and—burn the grass and weeds out, burn my side and he would burn his side. Q. And he asked you— A. I said just as well burn here as any and I stayed to help. Q. And he asked you if you would help him, is that correct? A. Well, yes, and assist him while we both had to burn it at the same time. Q. At that time did you tell Mr. Raugust about the orders you had received from your company? A. Yes. Q. Did Mr. Raugust tell you about the orders he had received from his company? A. I don't remember if he did or not, but the city had been after him like they were me every week or ten days. Q. Now, then, after you met at that location, where did you go right after that? A. I unloaded my fire equipment there. I had a ten gallon can of water and two fire extinguishers. Q. And then where did you go? A. I backed up to the depot and shut my motor-car off. Q. And that was in accordance with the plan? A. Yes. Q. That you and Raugust had made, is that right? A. Yes, sir. Q. Then you started burning the right of way? A. Yes. Q. And you lit your right of way first? A. Yes, sir."

The Union Pacific crew had two fire extinguishers and shovels, and the Great Northern crew had shovels. It was agreed that each crew would work from its own tracks down to the creek, regardless of the right of way line. There was a wind blowing from the east, which increased some in volume as the burning continued. The area burned was 960 feet long. The two crews started at a street bridge to the west of the warehouse and proceeded east, against the wind, to a Great Northern bridge, located to the east of the warehouse. The work was done by patch burning— that is, a crew would burn a strip about fifty or one hundred feet wide, before igniting another strip. The Union Pacific

crew started first, going about two hundred feet before the Great Northern crew started. At one time a pole on the Great Northern right of way had caught fire up about ten feet, and a Great Northern man borrowed a fire extinguisher from a Union Pacific man to put the fire out.

Mr. Raugust testified:

"And part of the time, then, you were burning, were working and burning on the UP right of way, isn't that correct? A. Well, I don't know the line as far as that is concerned. We were burning there in conjunction. Q. You were burning in conjunction? A. Yes. Q. Now, what do you mean, burning in conjunction? A. Cleaning that creek out."

The testimony is in conflict as to whether or not sparks emanated from the burning rights of way. Several city firemen testified that they saw sparks and burning embers rising from the burned area. The section men and several people living opposite the Great Northern tracks testified that they saw no flames, sparks, or embers, just smoke. It is undisputed that before this burning operation began that morning, no other smoke was seen in that area. However, one of the Great Northern section men testified under cross-examination that, in some places, flames would rise three or four feet in height, and that the wind was strong enough to blow the fires down to the creek.

On the morning in question, a crew of men were working at the mill, processing peas. They were working near door No. 2, which was open. About nine o'clock, quite a heavy smoke came through the door, and the foreman went outside and saw the section crews burning weeds on the rights of way. About 10:30, a heavy smoke was noticed coming from the basement, just west of the door. No flames were visible. The fire department was called, and some of the section men came over. One man tore a piece of siding off with a shovel, and then the flames shot out. The walls of the mill were sealed with sawdust. A few weeks earlier, the siding had been partially repaired, but there remained numerous cracks, crevices, and warping in the siding offer-

ing a lodgment for a spark or an ember to get inside of the walls.

As a result of the fire, there was considerable damage to the building, and also to the peas which were stored therein. The insurance company paid the damage and obtained an assignment from the mill of its cause of action against the defendants.

At the time of the fire, there was in force a lease agreement, entered into June 25, 1946, between the Oregon-Washington Railroad and Navigation Company and its lessee, Union Pacific Railroad Company, collectively, as lessor, and White Mill, Inc., as lessee, leasing the premises occupied by the mill for an annual rental of $110. Section 13 of the lease provided:

"It is understood by the parties hereto that the leased premises are in dangerous proximity to the tracks of the Lessor, and that by reason thereof there will be constant danger of injury and damage by fire, and the Lessee accepts this lease subject to such danger.

"It is therefore agreed, as one of the material considerations for this lease and without which the same would not be granted by the Lessor, that the Lessee assumes all risk of loss, damage or destruction of or to buildings or contents of the leased premises, and of or to other property brought thereon by the Lessee or by any other person with the knowledge or consent of the Lessee and of or to property in proximity to the leased premises when connected with or incidental to the occupation thereof, and any incidental loss or injury to the business of the Lessee, where such loss, damage, destruction or injury is occasioned by fire caused by, or resulting from, the operation of the railroad of the Lessor, whether such fire be the result of defective engines, or of negligence on the part of the Lessor or of negligence or misconduct on the part of any officer, servant or employe of the Lessor, or otherwise, and the Lessee hereby agrees to indemnify and hold harmless the Lessor from and against all liability, causes of action, claims, or demands which any person may hereafter assert, have, claim or claim to have, arising out of or by reason of any such loss, damage, destruction or injury, including any claims, cause of action or demand which any insurer of such buildings or other property may at any time assert, or undertake to assert, against the Lessor."

At the trial, the court dismissed the defendants Oregon-Washington Railroad and Navigation Company and Union Pacific Railroad Company (see *United States Fire Ins. Co. v. Northern Pac. R. Co.*, 30 Wn. (2d) 722, 193 P. (2d) 868), and rendered judgment against Great Northern Railway Company in the sum of $8,275.99.

Error is assigned: (1) in holding the evidence sufficient to establish that the damage to warehouse and peas was caused by the burning of grass and brush by the defendants; (2) in holding the evidence sufficient to establish that the defendants were negligent; (3) in finding that the warehouse caught on fire as a proximate result of negligence of the defendants; (4) in finding that defendants were acting in concert and conjunction and according to a general plan in starting the fires and burning their rights of way; (5) in concluding that appellant is jointly and severally liable; (6) in holding that the appellant is not entitled to the benefits of section 13 of the lease; (7) in refusing to find that respondent's assignor was contributorily negligent in permitting sawdust and shavings to be exposed by cracks and warps in the outer wall of the warehouse, and to fall and remain on the ground at the foot of the wall; (8) in refusing to grant appellant's motion for nonsuit; (9) in granting judgment against appellant; and (10) in denying motion for new trial.

Proof that the fire in respondent's warehouse started from the fires set on the rights of way of the Union Pacific and Great Northern railways is circumstantial. However, the testimony showed that at that time there were no other fires in the vicinity; there were no men smoking near where the fire broke out; there were no stoves, fires in the warehouse, nor were there any motors, wiring, switches or electrical equipment near enough to have caused the fire. There was evidence of a wind, which increased in velocity; of the burning by the crews; of flames as a result of the burning. The evidence is quite persuasive that the fire could not have originated from any other source. See *Abrams v. Seattle & Mont. R. Co.*, 27 Wash. 507, 68 Pac. 78;

*Northwestern Mut. Fire Ass'n v. Northern Pac. R. Co.,* 68
Wash. 292, 123 Pac. 468, Ann. Cas. 1913E, 968; *Hinckley v.
Shell Co. of California,* 127 Wash. 630, 221 Pac. 594.

Rem. Rev. Stat., § 5647 [P.P.C. § 115-87], provides:

"If any person shall for any lawful purpose kindle a fire
upon his own land, he shall do it at such time and in such
manner, and shall take such care of it to prevent it from
spreading and doing damage to other persons' property, as
a prudent and careful man would do, and if he fail so to
do he shall be liable in an action to any person suffering
damage thereby to the full amount of such damage."

*Jordan v. Welch,* 61 Wash. 569, 112 Pac. 656, was an ac-
tion for damage to respondent's meadow, as the result of
a fire started by sparks from a steam shovel operated by
appellant, a railroad contractor. There, the fire had not
been kindled on appellant's land, and the statute was not
applicable. However, after quoting the above statute, this
court said:

"While this statute has no special controlling force here,
as this action is not within its terms, it is indicative of the
declared policy of this state in requiring care and caution
in handling and controlling such a destructive agency."

We also said:

"Thompson on Negligence, § 2277, says:
" 'The circumstances may be such that the mere act of
setting the fire will involve such obvious danger to adjoin-
ing property as affords of itself evidence of negligence.'
"The season was dry, the fire was in August, the right of
way and the respondent's meadow were dry and easily ig-
nited. The soil itself burned easily and, when once ignited,
would burn below the surface until moisture was reached.
Under such circumstances it was the duty of appellants to
take precaution against the communicating of any fire to
the right of way, or its spread to adjoining lands."

See, also, *Seibly v. Sunnyside,* 178 Wash. 632, 35 P. (2d)
56.

In the instant case, a wind was blowing from the south-
east. It increased in velocity as the burning progressed.
The mill was in close proximity to the burning operation.
Neither the city nor the mill had been notified that the

burning would take place that day. The railroads did not have sufficient equipment, nor a sufficient crew, and did not display the proper care and caution in "handling and controlling such a destructive agency." Under the circumstances, such lack of care constituted negligence.

■■ Furthermore, the trial court, which saw the witnesses, heard them testify, observed their demeanor while testifying, and weighed their testimony, found that the fire originated from the negligent burning of the rights of way by the railroad crews, and that such negligence was the proximate cause of the damage suffered by respondent's assignor. We have held many times that the findings of the trial court will not be disturbed by us unless we can say that such findings are clearly not supported by the weight of the evidence. *Wade v. Bartek*, 30 Wn. (2d) 483, 191 P. (2d) 701.

We cannot say that the findings of the trial court that the damage was caused by the burning of defendants; that the defendants were negligent; and that their negligence was the proximate cause of the fire; and that respondent's assignor was not contributorily negligent, are clearly not supported by the weight of the evidence.

■ Error is assigned on the finding that the two crews were acting in concert and according to a general plan. It is pointed out that each crew attended to its own burning, and that each fire was separate from the other. It is contended that there were two separate and distinct burning operations, which happened to take place on the same day. However, it must be remembered that each crew burned from its own tracks down to the creek, regardless of the right of way·line. At times the Great Northern crew was burning on the Union Pacific right of way, and the Union Pacific crew was burning on the Great Northern right of way. At the extreme right end of the area burned, the creek flows under the Great Northern bridge, and at that point the Union Pacific men were working right up to the shoulder of the Great Northern tracks. The work was done in this manner to more conveniently carry out the operation as planned.

Complaints had been sent to both companies by the city officials. Prior to October 19th, each crew had cut the brush and had laid it on its bank of the creek. John Campbell, district road master of the Great Northern, testified:

"The forces of each section crew were small, and the object was to get the men together and have more men to do the work so that it could be completed in the same day, that is, finished the same day."

It was no accident that the crews met there that day. Raugust testified that when he approached Swanda the latter said, "Are you ready for us?" The fact that the Union Pacific crew started to burn first is indicative of a plan. About two hundred feet from where they started, there were some grain doors lying on the ground, and it was not until after they were cleared that the Great Northern crew started to burn. It happened that the only emergency necessitating active co-operation between the crews was when a pole on the Great Northern right of way caught fire and a Great Northern man borrowed a fire extinguisher from a Union Pacific man to put it out. Both crews were there, ready to assist the other. We are satisfied that the crews were working in concert, and that the burning by them was one project.

Having heretofore determined that the fire was the result of defendants' negligence, it follows that the damage to the warehouse was caused by a joint tort, and the defendants became joint tort-feasors. *Young v. Dille*, 127 Wash. 398, 220 Pac. 782.

When two or more persons act in concert, and their joint act is negligent, they are all liable in damages jointly and severally, to the person injured because of such negligent act. 52 Am. Jur. 450, Torts, § 111.

" . . . that where two or more owe to another a common duty and by a common neglect of that duty such other person is injured, then there is a joint tort with joint and several liability." 1 Cooley on Torts 276, § 86. See, also, *Swain v. Tennessee Copper Co.*, 111 Tenn. 430, 78 S. W. 93.

 Appellant contends that, if it should be found that it and the Union Pacific were joint tort-feasors, then the release of the United Pacific would also release it, relying upon the rule that the release of one joint tort-feasor releases all. The release of a wrongdoer constitutes a satisfaction and extinguishes the cause of action arising out of the wrong, and therefore operates equally to discharge those jointly guilty thereof. The lease was an agreement between the Oregon-Washington Railroad and Navigation Company and the Union Pacific Railroad Company, as lessor, and the White Mill, as lessee, and was personal between the contractors. By section 13, as one of the material considerations for the lease, the *lessee* agreed to hold harmless the *lessor* from any fire which might result from the operation of the railroad of the *lessor*. It was not intended to benefit anyone other than the lessor.

In the case at bar, the Union Pacific was dismissed solely and entirely because of the contractual relationship existing between it and the mill. This did not extinguish the cause of action arising out of the wrong. The Union Pacific was still a wrongdoer and would be answerable in damages for the wrong, together with its joint tort-feasor, but for the contract. The fact that one joint tort-feasor is protected against liability does not affect the liability of the other tort-feasors. 52 Am. Jur. 455, Torts, § 117.

"By the great weight of authority, a covenant not to sue one joint contractor or one joint tort-feasor is held not to amount to a release, and therefore such an agreement is held not to discharge the other joint contractors or tort-feasors." 45 Am. Jur. 676, Release, § 4.

"Where two persons would otherwise be liable for a harm, one of them is not relieved from liability by the fact that the other has an absolute privilege to act *or an immunity from liability* to the person harmed." (Italics ours.) 4 Restatement of the Law 448, Torts, § 880.

In *Western Express Co. v. Smeltzer,* 88 F. (2d) 94, 112 A.L.R. 74, respondent was injured as the result of a collision between a truck in which he was riding and a truck operated by appellant's employee. The action was against

appellant. The jury found both drivers negligent. Appellant claimed error in the exclusion from evidence of a release executed prior to the accident, releasing the owner of the truck in which respondent was riding. The release provided:

" 'That in consideration of the carriage of the undersigned upon the Truck of said Orvil M. Metzler to Chicago and return, whether with or without charge for such carriage, each of the undersigned severally hereby voluntarily assume all risk of accident or damage to his or her person and property, and hereby release and discharge the said Orvil M. Metzler from every claim, liability or demand of any kind for or on account of any personal injury or damage of any kind sustained, whether caused by the negligence of said Orvil M. Metzler or otherwise.' "

The court held:

"The general common law rule is that a release of one joint tort feasor after the cause of action arises, and in satisfaction thereof, releases all joint tort feasors from liability for the same tort. [Citing cases.] The rule is based on the theory that the release constitutes a satisfaction and extinguishes the cause of action. This is true even though there is a reserved intention to look to other wrongdoers for further damages or compensation. . . . Since the doctrine relied on rests upon the principle that an action grounded upon joint tort is one and indivisible and is extinguished by the release, the reason underlying the doctrine does not here exist. As the instrument extinguished no existing cause of action, the District Court correctly excluded it."

*Wilder v. Pennsylvania R. Co.*, 245 N. Y. 36, 156 N. E. 88, 52 A. L. R. 188, was an action against the Pennsylvania Railroad Company and the Pennsylvania Tunnel & Terminal Railroad Company, for damages sustained when the plaintiff fell on a soapy and slippery floor of the waiting room, owned by the latter company. She was about to board a train of the Pennsylvania System and travel on a pass which provided:

" 'In consideration of the issuance of this free pass, I hereby assume all risks of personal injuries and all loss of

or damage to property from whatever causes arising, and release the Company from liability therefor.' "

The Pennsylvania Tunnel & Terminal Railroad Company contended that the release of the Pennsylvania Railroad Company also released it as a joint tort-feasor. The court said:

"In our opinion this view is untenable. The pass had none of the elements of a release. It was an agreement not to sue, made in consideration of the free use of railroad facilities. There was no claim in existence to be released at the time it was given. It spoke for the future, not the present or past. No liability existed, consequently there was none to be released. This contract, therefore, made on sufficient consideration with the Pennsylvania Railroad Company, did not apply to a joint tort feasor unless the contract expressly or by implication so provided."

The court then held that the pass entitled the plaintiff to continuous passage between New York and Norfolk, Virginia, and that she, by virtue of her contract, assumed all risk of personal injury over all roads over which she might travel with the use of the pass, the agreement having been made for the benefit of all connecting companies which honored the pass.

In the New York case, the plaintiff contracted for the benefit of any road over which she might travel. Here, the contract was solely for the benefit of the lessor, and was not for the benefit of the Great Northern. As to whether or not appellant could recover contribution from its joint wrongdoer, we express no opinion, because that question is not before us.

The judgment is affirmed.

MALLERY, C. J., ROBINSON, SIMPSON, and HILL, JJ., concur.