Philip **HALL**, An Infant, by Lloyd Hall, His Guardian Ad Litem, et al., Plaintiffs,

v.

**E. I. DU PONT DE NEMOURS & CO., INC.**, et al., Defendants.

Randy **CHANCE** et al., Plaintiffs,

v.

**E. I. DU PONT DE NEMOURS & CO., INC.**, et al., Defendants.

Nos. 69–C–273, 70–C–1107.

United States District Court, E. D. New York.

May 18, 1972.

356

Jerome Edelman, Brooklyn, N. Y., for plaintiffs; Melvin Block, Brooklyn, N. Y., of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant E. I. Du Pont De Nemours & Co.

Cravath, Swaine & Moore, New York City, for defendant Hercules Powder Co., Inc.

Rogers, Hoge & Hills, New York City, for defendant Atlas Chemical Industries, Inc.

Martin, Bloom, Lipton & Van De-Walle, Great Neck, N. Y., for defendant Austin Powder Co.

Littauer, Gordon, Ullman, Riseman & Ploscowe, New York City, for defendant Institute of Makers of Explosives.

Montfort, Healy, McGuire & Salley, Garden City, N. Y., for defendants American Cyanamid Co. and Olin Mathieson Chemical Corp.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

These two cases arise out of eighteen separate accidents scattered across the nation in which children were injured by blasting caps. Damages are sought from manufacturers and their trade association, the Institute of Makers of Explosives (I.M.E.). The basic allegation is that the practice of the explosives industry during the 1950's—continuing until 1965—of not placing any warning upon individual blasting caps and of failing to take other safety measures created an unreasonable risk of harm resulting in plaintiffs' injuries.

In most instances the manufacturer of the cap is unknown. The question posed is whether a group of manufacturers and their trade association, comprising virtually the entire blasting cap industry of the United States, can be held jointly liable for injuries caused by their product. Our answer is that there are circumstances, illustrated by this litigation, in which an entire industry may be liable for harm caused by its operations.

While the cases are closely linked in their litigation history and underlying legal theory, they differ in several crucial respects. See Hall v. E. I. Du Pont De Nemours & Co., 312 F.Supp. 358 (E. D.N.Y.1970) for an earlier phase of the litigation. In *Chance*, the name of the manufacturer who actually produced the cap causing a particular injury is apparently unknown. In *Hall* it is, plaintiffs allege, known. We turn to *Chance* first since it presents the more difficult legal problems.

## I. THE CHANCE CASE

### A. *Facts and Proceedings*

Thirteen children were allegedly injured by blasting caps in twelve unrelated accidents between 1955 and 1959. The injuries occurred in the states of Alabama, California, Maryland, Montana, Nevada, North Carolina, Tennessee, Texas, Washington and West Virginia. Plaintiffs are citizens of the states in which their injuries occurred. They are now claiming damages against six manufacturers of blasting caps and the I.M.E. on the grounds of negligence, common law conspiracy, assault, and strict liability in tort. In addition, two parents sue for medical expenses. Federal jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.

While the plaintiffs' injuries occurred at widely varied times and places, the complaint alleges certain features common to them all. Each plaintiff, according to the complaint, "came into possession" of a dynamite blasting cap which was not labeled or marked with a warning of danger, and which could be easily detonated by a child. In each instance an injurious explosion occurred.

The complaint does not identify a particular manufacturer of the cap which caused a particular injury. It alleges that each cap in question was designed and manufactured jointly or severally by the six corporate defendants or by other unnamed manufacturers, and by their trade association, the I.M.E.

Plaintiffs' central contention is that injuries were caused by the defendants' failure to place a warning on the blasting caps, and to manufacture caps which would have been less easily detonated. This failure, according to the plaintiffs, was not the result of defendants' ignorance of the dangerousness of their product to children. The complaint states that the defendants had actual knowledge that children were frequently injured by blasting caps, and, through the trade association, kept statistics and other information regarding these accidents. Recognizing the dangerousness of their product to children, the defendants, through the trade association, used various means—such as placards and printed notices—to warn users of the caps and the general public. These measures were allegedly inadequate in light of the known risks of injury. Moreover, defendants are said to have jointly explicitly considered the possibility of labeling the caps, to have rejected this possibility, and to have engaged in lobbying activities against legislation which would have required such labeling. The long-standing industry practice of not placing a warning message on individual blasting caps was, it is urged, the result of a conscious agreement among the defendants, in the light of known dangers, with regard to this aspect of their product.

The six corporate defendants are: E. I. Du Pont De Nemours & Co., Inc. ("Du Pont"), Hercules Powder Co. ("Hercules"), and Atlas Powder Co. ("Atlas"), all citizens of and having their principal places of business in Delaware; American Cyanamid Co. ("Cyanamid"), a citizen of Maine with its principal place of business in New Jersey; Olin Mathieson Chemical Corp. ("Olin"), a citizen of Virginia with its principal place of business in Connecticut; and Austin Powder Co. ("Austin"), a citizen of and having its principal place of business in Ohio. The defendant I.M.E. is an unincorporated association with its principal place of business in New York.

Defendants move to dismiss on the grounds that the plaintiff-children do not state claims upon which relief can be granted. They also request dismissal of the parents' claims for medical expenses as barred by statutes of limitations. Finally, they seek a severance on the grounds of improper joinder and transfer of the severed claims or their outright dismissal on the ground of inconvenient forum. 28 U.S.C. § 1404(a).

### B. *Issues Presented*

The issues common to products liability cases are well known: did the manu-

facturer (or other supplier) violate a duty of care to plaintiffs, and was the violation a legal or "proximate" cause of plaintiffs' injuries. 2 Harper & James, The Law of Torts §§ 28.1–.2 (1956). Moving to dismiss the complaint, defendants have the burden of showing "beyond doubt" that plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S. Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957).

A central question raised by defendants' motion is whether their parallel safety practices provide a basis for joint liability.

Interlaced with the issues of duty to warn, proximate cause, and joint liability is a conflicts question of considerable complexity: what choice-of-law principles are to be applied in a case such as. this one where planning, design, manufacture, and sale of a product occurred in different states, and injury in yet others?

█ Since, as indicated below, further briefs will be required on the choice-of-law problem, we have, for the purposes of this memorandum, assumed the existence of a national body of state tort law. A growing consensus on the substantive law in this country permits such a gross first approach to the preliminary motions before us since all we need to determine now is whether the plaintiffs might succeed on the law and facts. See, e. g., Wright v. Carter Products, 244 F.2d 53, 56–60 (2d Cir. 1956) (Massachusetts law applicable but general treatises, articles and case law of other states cited on motion to dismiss).

█ Under both negligence and strict liability standards manufacturers and other suppliers have a duty to users, consumers, and in some circumstances to the general public or portions of it, to produce products with appropriate warnings, instructions, and other safety features. See, e. g., Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816 (1962); Noel, Products Defective Because of Inadequate Directions or Warn-

ings, 23 Sw.L.J. 256 (1969); Rest.2d Torts § 388, comment e, § 402A, comments j, l (1965) (warnings under negligence and strict liability standards). Defendants' duty of care is basic to liability, and we turn first to that issue.

### C. Duty to Warn and Standard of Care

#### (1) Negligence

█ A manufacturer's duty to produce a safe product, with appropriate warnings and instructions where necessary, rests initially on the responsibility each of us bears to exercise care to avoid unreasonable risks of harm to others. See, e. g., 2 Harper & James, The Law of Torts § 28.3 (1956). An "unreasonable risk" in any given situation depends on the balancing of probability and seriousness of harm if care is not exercised against the costs of taking precautions. See, e. g., United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947); 2 Harper & James, supra §§ 16.9, 28.4; Rest. 2d Torts §§ 291–293, 298 (1965).

█ Activity involving a small likelihood of death or serious injury may require greater and more costly precautions than that involving a higher probability of lesser harm. See, e. g., The Glendola, 47 F.2d 206, 207 (2d Cir. 1931), cert. denied, 283 U.S. 857, 51 S. Ct. 650, 75 L.Ed. 1463 (1931); Rest. 2d Torts § 388, comment n at 309 (1965); 2 Harper & James, The Law of Torts § 16.9 at 931–32 (1956). Where an act involves

a risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility. Thus those who deal with firearms, explosives, poisonous drugs, or high tension electricity are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them. Rest. 2d Torts § 298, comment b at 69 (1965).

### (a) *Standard of Care*

■ In most products liability cases the court does not have to make an explicit determination that the defendant owed the plaintiff a duty of reasonable care. The general scope of such a duty is well established: manufacturers must provide products that are reasonably safe for their foreseeable use. *See, e. g.,* MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916); Rest. 2d Torts § 395 (1965); 2 Harper & James, The Law of Torts §§ 28.3–.9 (1956).

[6] In the explosives industry, producers have long been on notice that they have an obligation to users of their products to guard against defects (Dement v. Olin-Mathieson Chemical Corp., 282 F.2d 76, 80 (5th Cir. 1960)) and "to adequately warn a foreseeable purchaser or user of foreseeable and latent dangers upon proper and intended use of [the] product." Littlehale v. E. I. Du Pont De Nemours & Co., 268 F.Supp. 791, 798 (S.D.N.Y.1966), aff'd, 380 F.2d 274 (2d Cir. 1967). Similarly, those who use or store explosives have been held to a high standard of care, commensurate with the obvious dangers, to maintain storage facilities that are secure against tampering by children. *See e. g.,* Lone Star Gas Co. v. Parsons, 159 Okl. 52, 14 P.2d 369 (1932); Annot., 10 A.L.R.2d 22 (1950); 2 Harper & James, The Law of Torts § 20.5 at 1144, n. 34 (1956).

■ Defendants suggest, nevertheless, that because the plaintiff-children were neither purchasers nor intended users of the caps, their injuries were "unforeseeable" as a matter of law, and hence outside the scope of the duty of reasonable care. While cast in terms of foreseeability—a term of the experiential world—the issue is finally one of duty—a question of law and public policy. Green, The Causal Relation Issue in Negligence Law, 60 Mich.L.Rev 543, 562–569 (1962). Because foreseeability is one of the vectors bearing on the finding of duty, we must analyze the meaning of the term in the context of this case.

### (i) *Foreseeability*

■ "Foreseeability" at this stage of decision includes two related elements. The first is the likelihood or probability of harm if reasonable care is not exercised—"whether the harm threatened is likely to occur." Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 830 (1962). The second element is the manufacturer's actual or constructive knowledge of the risk—"whether the manufacturer was in a position to foresee the likelihood of such harm." *Id.* at 847.

The probability of the known risk needed to trigger the duty of reasonable care cannot be expressed in a mathematical formula. Judge Cardozo suggested that "[t]here must be knowledge of a danger, not merely possible, but probable." MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050, 1053 (1916). Since "probabilities" are but quantifications of "possibilities," what is meant in *MacPherson* is apparently a probability so low that it can be ignored in our everyday world. Judge Learned Hand, discussing foreseeability and scope of reasonable care in the context of proximate cause, utilized much the same formulation: "[The injurious result] has got to be one of those consequences which is not entirely outside the range of expectation or probability, as ordinary men view it." The Mars, 9 F. 2d 183, 184 (S.D.N.Y.1914). Judge Frank, adopting language of the New Hampshire Supreme Court, argued that the proper threshold test of the applicability of reasonable care "is not of the balance of probabilities, but of the existence of some probability of sufficient moment to induce action to avoid it on the part of a reasonable mind." Tullgren v. Amoskeag Mfg. Co., 82 N.H. 268, 276, 133 A. 4, 8 (1926), cited with approval in Hentschel v. Baby Bathinette Corp., 215 F.2d 102, 106 (2d Cir. 1954) (Frank, J., dissenting), cert. denied, 349 U.S. 923, 75 S.Ct. 663, 99 L. Ed. 1254 (1955), and in Pease v. Sinclair Refining Co., 104 F.2d 183, 186 (2d

**362**

Cir. 1939); *cf.* 2 Harper & James, The Law of Torts § 18.2 at 1018–1026, particularly at 1020 (1956).

▓ Whatever the verbal formulation, the concept of "foreseeable risk" is universally taken to mean the foreseeability of a general kind or type of risk, rather than the foreseeability of the precise chain of events leading to the particular injury in question. *See, e. g.,* Pease v. Sinclair Refining Co., 104 F.2d 183, 186–87 (2d Cir. 1939); 2 Harper & James, The Law of Torts § 18.2 at 1026, § 20.5 at 1147–49 (1956).

▓ The related issue of whether the manufacturer was in a position to foresee the risk turns on whether "the manufacturer knew, or through the exercise of reasonable care should have known, of the existence of the danger." Dillard & Hart, Products Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 156–57 (1955). Plaintiffs must demonstrate actual notice to the manufacturer of particular kinds of risks (*see, e. g.,* Noel v. United Aircraft Corp., 219 F.Supp. 556, 568–69 (D.Del.1963), aff'd in pertinent part, 342 F.2d 232 (3d Cir. 1965), or reasonable inferences from known characteristics of the product and its use. *See, e. g.,* Larsen v. General Motors Corp., 391 F.2d 495, 501–505 (8th Cir. 1968); Simpson Timber Co. v. Parks, 369 F.2d 324 (9th Cir. 1966) and 369 F.2d 324, 333–35 (9th Cir. 1966) (Browning, Hanley, Merrill, and Duniway, JJ., dissenting), vacated sub nom. Parks v. Simpson Timber Co., 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319 (1967), discussed in Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Sw. L.J. 256, 275–77 (1969); *see also* Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 834–36, 856–66 (1962).

The plaintiffs' injuries in this case are within the range of reasonable expectation and probability. They are likely to occur in the absence of reasonable care. The manufacturer has capacity to foresee them. Plaintiffs allege that the manufacturers not only "had reason to know," but that they actually knew, through information collected by the trade association, that children were injured in accidents involving blasting caps. According to statistics submitted by the plaintiffs, the number of such accidents between 1955 and 1959 which were known to the manufacturers ranged from 86 to 137 per year. See statistical tables said to be based on I.M.E. data submitted as Exhibits 2A and 2B, Plaintiffs' Memorandum in Opposition, August 26, 1971, in Hall v. Du Pont, 69–C–273.

Defendants do not deny that they had knowledge of these accidents. They claim to have taken all reasonable feasible steps to reduce the risk of their occurrence. Moreover, they argue that they did not deal with plaintiffs, never saw them, and are in court today only through a third party's carelessness, thus invoking (in part) the familiar doctrine that limits a manufacturer's liability to injuries caused by his product when put to its "intended use."

A manufacturer's liability for failure to exercise reasonable care ordinarily extends only to "those who use [the product] for a purpose for which the manufacturer should expect it to be used and . . . those whom [the manufacturer] should expect to be endangered by its probable use" when "physical harm is caused to them by [the product's] lawful use in a manner and for a purpose for which it is supplied." Rest. 2d Torts § 395 (1965). Comment *j* to section 395 of the Second Restatement of Torts, titled "Unforeseeable use or manner of use," explains that:

The liability stated in this Section is limited to persons who are endangered and the risks which are created in the course of uses of the chattel which the manufacturer should reasonably anticipate. In the absence of special reason to expect otherwise, the maker is entitled to assume that his product will be put to a normal use, for which the product is intended or appropri-

ate; and he is not subject to liability when it is safe for all such uses, and harm results only because it is mishandled in a way which he has no reason to expect, or is used in some unusual and unforeseeable manner.

*See also* Mazzi v. Greenlee Tool Co., 320 F.2d 821, 823 (2d Cir.1963) (applying New York law and collecting cases and authorities).

This doctrine has been applied in two cases involving explosives manufacturers to insulate them from liability when their products, manufactured for specialized purposes, came into the possession of untrained third parties who were injured while using them. *See* Littlehale v. E. I. Du Pont De Nemours & Co., 268 F.Supp. 791 (S.D.N.Y.1966), aff'd, 380 F.2d 274 (2d Cir.1967); Harper v. Remington Arms Co., 156 Misc. 53, 280 N.Y.S. 862 (Sup.Ct.1935), aff'd mem., 248 App.Div. 713, 290 N.Y.S. 130 (1st Dep't 1936), leave to appeal denied, 272 N.Y. 675 (1936).

■ Despite the general validity of the intended use principle, it does not warrant a conclusion that the blasting cap manufacturers in this case had no duty of reasonable care to the plaintiff-children. The doctrine of intended use is an illustration of the broader doctrine of foreseeability. A manufacturer cannot ignore a probable "misuse" of his product. This interpretation is shared by many courts including the Fourth Circuit in Spruill v. Boyle-Midway, Inc., 308 F.2d 79 (1962), the Eighth Circuit in Larsen v. General Motors Corp., 391 F.2d 495 (1968), and the Second Circuit in Mazzi v. Greenlee Tool Co., 320 F.2d 821 (1963). As the Fourth Circuit pointed out, in a case involving a child's death from eating furniture polish,

"Intended use" is but a convenient adaptation of the basic test of "reasonable foreseeability" framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence. "Intended use" is not an inflexible formula to be apodictically applied to every case. Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

However, he must also be expected to anticipate the environment which is normal for the use of his product and where, as here, that environment is the home, he must anticipate the reasonably foreseeable risks of the use of his product in such an environment. These are risks which are inherent in the proper use for which his product is manufactured. Thus where such a product is an inherently dangerous one, and its danger is not obvious to the average housewife from the appearance of the product itself, the manufacturer has an obligation to anticipate reasonably foreseeable risks and to warn of them, though such risks may be incidental to the actual use for which the product was intended. Spruill v. Boyle-Midway, Inc., 308 F.2d 79, 83–84 (1962).

Applying this analysis to the field of automobile safety, the Eighth Circuit concluded that

Automobiles are made for use on the roads and highways in transporting persons and cargo to and from various points. This intended use cannot be carried out without encountering in varying degrees the statistically proved hazard of injury-producing impacts of various types. The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident. Larsen v. General Motors Corp., 391 F.2d 495, 501–502 (1968).

The Second Circuit endorsed a similar approach in *Mazzi,* when it held that the evidence in the case would support a jury verdict "that such usage was in-

tended or that defendant should have reasonably foreseen that its [product] would be so used. . . ." Mazzi v. Greenlee Tool Co., 320 F.2d 821, 825 (1963). See also 2 Harper & James, The Law of Torts § 28.4 at 1541, n. 2 (1956) and Supplement at 215 (1968).

In the context of this approach to the problem of intended use, we find the complaint in this case easily distinguishable from the plaintiffs' position in Littlehale v. E. I. Du Pont De Nemours & Co., 268 F.Supp. 791 (S.D.N.Y.1966), aff'd, 380 F.2d 274 (2d Cir.1967) and in Harper v. Remington Arms Co., 156 Misc. 53, 280 N.Y.S. 862 (Sup.Ct.1935), aff'd mem., 248 App.Div. 713, 290 N.Y.S. 130 (1st Dep't 1936). In Littlehale defendant Du Pont had manufactured blasting caps under government contract for use by Army Ordnance personnel. The trial court found that "the user [Army Ordnance] was as well or more fully informed of the hazards involved and the correct methods of use as was the manufacturer" (268 F.Supp. at 803), and hence the manufacturer was under no duty to warn its customer of "generally known risks." 268 F.Supp. at 798. Such a duty could not arise, the trial court concluded, "at some later date by reason of some unforeseeable disposition of the product by [the] initial purchaser." 268 F.Supp. at 803. In reaching this conclusion, the trial court stressed that

> [this] is not a case involving a product manufactured for sale or resale to the general public. It is not a case involving negligence in the manufacture, design or use of materials. It is not a case where the manufacturer had any freedom of choice as to manufacture, design, or use of materials. It is not a case where evidence has been submitted upon which foreseeability of the particular use involved herein could be predicated. 268 F.Supp. at 801-02 (citations omitted).

In these circumstances, the Second Circuit found the trial court justified in concluding that "as a matter of law du Pont . . . could not have foreseen that its detonators would be used by a person untrained in the handling of such explosives and in a manner that was never intended." Littlehale v. E. I. Du Pont De Nemours & Co., 380 F.2d 274, 276 (2d Cir.1967).

Plaintiffs' allegations in this case present a different picture. The complaint promises submission of evidence that the manufacturers not only could have foreseen, but actually did foresee that "[their] detonators would be used by [persons] untrained in the handling of explosives and in a manner that was never intended." Id. In contrast to the rigid wartime specifications involved in the production of the caps in Littlehale, the defendants in this case apparently had complete freedom of choice as to manufacture, design, and use of materials, and exercised that choice, in the words of a Du Pont employee, in a manner "keyed to the needs of our customers." Ramsdell affidavit, Sept. 3, 1971, p. 3. While no allegations have been made about whether the caps involved in this case were manufactured for sale to "the general public," it is clear that their use and circulation was expected to be considerably more widespread than purchase and use by a specialized government agency. Cf. 34 Fed.Reg. 5838 (March 28, 1969) (warning re blasting caps to "Keep out of the reach of children"). Because of these differences, we cannot conclude, as did the trial court in Littlehale, that (1) there is no factual dispute "as to the identity of the intended and actual purchaser [or user]" and (2) that, as a matter of law, plaintiffs are excluded from the foreseeable "orbit of danger." Littlehale v. E. I. Du Pont De Nemours & Co., 268 F. Supp. 791, 801 (S.D.N.Y.1966).

The Harper case is distinguishable on similar grounds. In that case the defendant manufacturer had produced shot-gun shells of special explosive force for use in arms testing and they were marked to warn the class who would use them for this purpose. A jury verdict for the plaintiff was reversed because the plaintiff "failed to show that he was

a person whom the defendant might reasonably have anticipated would use these shells" and hence was not owed a duty of warning and reasonable care by the manufacturer. Harper v. Remington Arms Co., 156 Misc. 53, 58, 280 N.Y.S. 862, 868 (Sup.Ct.1935), aff'd mem., 248 App.Div. 713, 290 N.Y.S. 130 (1st Dep't 1936).

▇ The allegations in the present case preclude a decision at this stage that children were not foreseeable users of blasting caps. Even if the blasting cap manufacturers' own definition of their product's intended use were accepted as controlling, plaintiffs have alleged that the manufacturers had, in the words of comment *j* of section 395 of the Second Restatement of Torts, "special reason to expect" unusual uses of their product by children. A manufacturer's actual knowledge of unusual risks is the archetype reason for extending his duty of reasonable care beyond the scope of his product's normally intended use. *See, e.g.,* Simpson Timber Co. v. Parks, 369 F.2d 324, 327–28 (9th Cir.1966), vacated on other grounds sub nom. Parks v. Simpson Timber Co., 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319 (1967). As the Eighth Circuit has pointed out, the *Simpson* case now stands for the broad proposition that a manufacturer has a duty of reasonable care with respect to unintended uses "where the injury resulting from that unintended use was *foreseeable or should have been anticipated.*" Larsen v. General Motors Corp., 391 F.2d 495, 501 (1968) (citations omitted) (emphasis supplied).

Application of general principles of foreseeability and reasonable care to unintended uses is not peculiar to modern products liability cases. A similar approach can be found in numerous cases decided in the nineteenth and early twentieth centuries involving children playing with railroad turntables, dynamite blasting caps, and other dangerous instruments and machines. Even in an era when landowners had very limited duties of care to trespassers, many courts recognized that the likelihood of children playing with dangerous instruments was sufficiently foreseeable to impose a duty of care on the owners to provide appropriate locks, fences, notices, storage sheds, and other safety devices. *See, e.g.,* Sioux City and P. R. Co. v. Stout, 84 U.S. 657, 17 Wall. 657, 21 L.Ed. 745 (1873) (affirming jury finding of owner's negligence to children in failing to provide turntable lock); Edgington v. Burlington, C. R. & N. Ry. Co., 116 Iowa 410, 90 N.W. 95 (1902) (discussing numerous aspects of foreseeable danger to children from turntables); Lone Star Gas Co. v. Parsons, 159 Okl. 52, 14 P.2d 369 (1932) (finding liability of landowner to trespassing children for negligent storage of blasting caps); *see also* Lynch v. Nurdin, 1 Q.B. 29, 113 Eng.Rep. 1041 (1841) Prosser, Law of Torts § 59 at 364–376 (4th ed.1971); 2 Harper & James, The Law of Torts § 18.2 at 1020 (1956).

The doctrines evolved in these cases are now embodied in section 339 of the Second Restatement of Torts. According to Dean Prosser's commentary on this section and its judicial antecedents, the foreseeability elements of landowners' liability to children are very similar to the foreseeability issues involved in manufacturers' liability for unintended uses. The possessor must know "or have reason to know that children are likely to trespass," and the condition in question "must be one which the occupiers should recognize as involving an unreasonable risk of harm to such children." Prosser, Law of Torts § 59 at 368, 369 (4th ed. 1971). Whether failing to guard against the known risk is unreasonable is in turn determined by the general negligence principles of probability (including obviousness), seriousness of harm and cost of taking appropriate precautions. *Id.* at 369–71, 375–76.

Plaintiffs' allegations provide a basis for finding that injuries to children were a foreseeable risk of the use and circulation of blasting caps, and that this risk was known to, or should have

been known to, the individual manufacturers. It must be emphasized that we are not holding, at this stage, that the defendants in this case had a duty of reasonable care to each of the plaintiff-children. That decision can be made only after presentation of facts relevant to the risk and cost analysis, and determination of any conflict of laws issues.

### (ii) Costs and Social Utility

■ While foreseeability of risk is an essential element of a finding that a manufacturer is under a duty of care to persons in a particular position, it is not the only element in the decision. An important factor is the cost of taking precautions against the danger. The declaration that a duty or standard of reasonable care is applicable to an injury-causing situation involves

> various and sometimes delicate policy judgments. The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; . . . . and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty. Raymond v. Paradise Unified School Dist. of Butte County, 218 Cal.App.2d 1, 8, 31 Cal.Rptr. 847, 851–52 (3d Dist.1963).

See also Lone Star Gas Co. v. Parsons, 159 Okl. 52, 56–57 14 P.2d 369, 373–74 (1932) ; Chicago B. & Q. R. Co. v. Krayenbuhl, 65 Neb. 889, 902–04, 91 N.W. 880, 882–83 (1902) ; Prosser, Palsgraf Revisited, 52 Mich.L.Rev. 1, 15 (1953).

In many situations the "cost" or "social utility" side of the initial calculus of duty is relatively clear-cut. For example, the cost of printing and attaching labels and other warning devices is often regarded as trivial compared to the risk of any substantial harm. See, e.g., Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623, 625–26 (2d Cir.1961) ; Wright v. Carter Products, Inc., 244 F.2d 53, 59 (2d Cir. 1957) ; Pease v. Sinclair Refining Co., 104 F.2d 183, 186 (2d Cir.1939).

This may not be such a case. The defendants have indicated that there was doubt about the technical feasibility of labeling individual blasting caps during the 1950's, or of producing caps which could be less easily detonated by children, and that in any event the costs would have been substantial. Such facts, if proven, are clearly relevant to the question of defendants' duty of care, but they do not warrant a judgment in their favor on a motion to dismiss. Where the foreseeable risks of a product's use are sufficiently serious—particularly to large numbers of people—courts have not hesitated to require manufacturers to face substantial costs in warnings, testing, inspection, and safety design. See, e.g., Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir.1968) ; Manos v. Trans World Airlines, 324 F.Supp. 470 (N.D.Ill.1971) ; Noel v. United Aircraft Corp., 219 F. Supp. 556 (D.Del.1963), aff'd in pertinent part, 342 F.2d 232 (3d Cir.1965) ; Ambriz v. Petrolane Ltd., 49 Cal.2d 470, 319 P.2d 1 (1957), reversing 312 P.2d 11, 17 (4th Dist.Ct.App.1957). As with the issue of foreseeability, the issue of costs, social utility, and potential practical remedies can only be decided after a full factual presentation and analysis of applicable law.

### (b) Duty to Warn and Proximate Cause

■ In addition to showing that warnings (or other safety features) were required by the standard of reasonable care and that defendants failed to give such warnings or failed to give

them in an adequate manner, plaintiffs must establish a causal connection. They must show (1) that defendants' failure to warn was a "cause in fact" of their injuries—*i.e.*, the warnings might have averted the particular accident— and (2) that defendants' failure to warn was a "proximate cause" of their injuries—*i.e.*, intervening events, remoteness or general policy considerations do not prevent a finding of liability. *See, e.g.*, Green, The Causal Relation Issue in Negligence Law, 60 Mich.L.Rev. 543, 548–569 (1962); 2 Harper & James, The Law of Torts §§ 20.1–.6 at 1108– 1161 (1956) and Supplement at 92–104 (1968). *But cf.* Harper and James, *id.* Supplement at 93 ("the dichotomy is not a clear one").

Existence of the I.M.E. safety program and the possibility of intervening acts by others are relevant to the question of defendants' liability for failure to warn, but they do not entitle defendants at this stage to a judgment as a matter of law. The practice of the explosives industry of supplying warnings to customers and users through notices printed on and inserted in packages of blasting caps has already been the subject of litigation. In Eck v. E. I. Du Pont De Nemours & Co., 393 F.2d 197 (7th Cir.1968), the Seventh Circuit held that whether such warnings had adequately served notice on an injured workman, "either personally or vicariously, raised an issue of fact which the court should have submitted to the jury." 393 F.2d 197, 201. The adequacy of printed warnings and the I.M.E. safety program is even less clear-cut in this case, where the manufacturers cannot claim that children, in contrast to workmen using blasting caps, are aware of risks generally known in the trade. *Cf.* Hopkins v. E. I. Du Pont De Nemours & Co., 199 F.2d 930, 933 (3d Cir.1952), judgment reversed on basis of Pennsylvania law, 212 F.2d 623 (3d Cir.1954); Canifax v. Hercules Powder Co., 237 Cal.App.2d 44, 54–55, 46 Cal.Rptr. 552, 559 (3d Dist.1965).

The defendants' contention that warnings on the caps might have been ineffective had they been given, refers to problems of proof which clearly cannot be resolved prior to a full factual presentation. *See* 2 Harper & James, The Law of Torts, § 20.2 at 1113–14 (1956) and Supplement at 94–95 (1968); Green, The Causal Relation Issue In Negligence Law, 60 Mich. L.Rev. 543, 559–60 (1962); *cf.* Jacobs v. Technical Chemical Co., 472 S.W.2d 191, 196–200 (Tex.Ct.Civ.App.1971); Haft v. Lone Palm Hotel, 3 Cal.3d 756, 768–69, 91 Cal.Rptr. 745, 752, 478 P.2d 465, 472 (1970).

■ The general rule on intervening acts and proximate cause includes the element of foreseeability: an intervening act by a third person (even if negligent) relieves the original negligent actor from liability only if "the subsequent wrongdoer's act could not have been anticipated by the first actor in the exercise of due care." Boeing Airplane Co. v. Brown, 291 F.2d 310, 317–18 (9th Cir. 1961); *see also* Rest.2d Torts § 447(a) (1965); 2 Harper & James, The Law of Torts, § 28.10 at 1555, § 20.5 at 1141–46 (1956).

In many cases the defendant's negligence rests precisely on his failure to guard against the risks of foreseeable misconduct by others, and the occurrence of such misconduct, "whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." Rest.2d Torts § 449 (1965). Alternatively stated, "[t]he happening of the very event the likelihood of which makes the actor's conduct negligent cannot relieve him from liability." Rest.2d Torts § 449, comment *b* (1965); *cf.* Petition of Kinsman Transit Co., 338 F.2d 708, 723–24 (2d Cir. 1964), cert. denied sub nom. Continental Grain Co. v. City of Buffalo, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965).

A typical application of this principle is found in numerous cases holding that

trespassing, tampering, and other misconduct by children, particularly in relation to dangerous instruments and machinery, is a foreseeable risk whose occurrence does not insulate a defendant who has failed to provide reasonable safeguards. *See* 2 Harper & James, The Law of Torts, § 20.5 at 1144 n. 34 (1956) and Supplement at 100 (1958); Rest.2d Torts § 449, Appendix at 245–57 (1966). Even if it were determined that such acts, or certain kinds of acts, constituted superseding causes, it would still be a question for the jury (assuming sufficiency of the plaintiffs' evidence) as to whether they actually occurred. *See* McLaughlin v. Mine Safety Appliances, 11 N.Y.2d 62, 71–72, 226 N.Y.S.2d 407, 413–14, 181 N.E.2d 430, 435 (1962).

### (2) *Strict Liability*

 A duty to warn may be imposed on a manufacturer under strict liability principles if without a warning his product would be "in a defective condition unreasonably dangerous to the user or consumer." Rest.2d Torts § 402A and comment *j* (1965). Whether a product is "defective" or "unreasonably dangerous" depends on the same considerations respecting harm already discussed in the context of negligence: foreseeability, seriousness and cost of preventing. Under strict liability principles, however, they are applied in a somewhat different manner. The plaintiff does not have to identify and prove a particular failure to exercise reasonable care on the part of the manufacturer, nor can the manufacturer assert in defense that the product's design or manufacture was carried out with reasonable care. *See, e. g.,* O'Keefe v. Boeing Co., 335 F.Supp. 1104, 1118–19, 1132 (S.D.N.Y.1971); Cunningham v. MacNeal Memorial Hospital, 47 Ill.2d 443, 453–54, 266 N.E.2d 897, 902 (1970); Rest.2d Torts § 402A(a) (1965).

There are two reasons for imposing strict liability on manufacturers. They may be summarized by the phrases "incentive" and "risk allocation."

A manufacturer is in the best position to discover defects or dangers in his product and to guard against them through appropriate design, manufacturing and distribution safeguards, inspection and warnings. *See, e. g.,* Vandermark v. Ford Motor Co., 61 Cal.2d 256, 260–63, 37 Cal.Rptr. 896, 898–900, 391 P.2d 168, 170–72 (1964); Escola v. Coca-Cola Bottling Co. of Fresno, 24 Cal.2d 453, 461, 150 P.2d 436, 440–41 (1944) (Traynor, J., concurring); James, General Products—Should Manufacturers Be Liable Without Negligence?, 24 Tenn.L.Rev. 923 (1957). A rigorous rule of liability with enhanced possibilities of large recoveries is an "incentive" to maximize safe design or a "deterrence" to dangerous design, manufacture, and distribution. *See, e. g.,* Vandermark v. Ford Motor Co., 61 Cal. 2d 256, 260–63, 37 Cal.Rptr. 896, 898–900, 391 P.2d 168, 170–72 (1964); Katz, The Function of Tort Liability in Technology Assessment, 38 U.Cinn.L.Rev. 587, 607–08, 631–36 (1969).

The fact that the safety practices of entire industries have been held to be below the standard of reasonable care indicates the need for broad safety incentives. *See* Marsh Wood Products Co. v. Babcock and Wilcox Co., 207 Wis. 209, 218–19, 240 N.W. 392, 396 (1932); The T. J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932); *cf.* Canifax v. Hercules Powder Co., 237 Cal.App.2d 44, 55, 46 Cal.Rptr. 552, 559 (3d Dist.1965); Katz, The Function of Tort Liability in Technology Assessment, 38 U.Cinn.L.Rev. 587, 631–36 (1969).

A second approach has been variously expressed as "loss distribution," "risk allocation," or "enterprise liability." Regardless of safety measures taken by manufacturers and distributors, accidents and injuries will inevitably occur which can be fairly said to have been wholly or partly caused by some defective characteristic of the product involved. Accidents and injuries, in this view, are seen as an inevitable and statistically foreseeable "cost" of the product's consumption or use. *See, e. g.,*

Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 63–64, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1962).

The policy question of who should bear this cost has already been resolved in the great majority of jurisdictions which have adopted the principle of strict tort liability for manufacturers and suppliers, or its equivalent, implied warranty without privity. See, for compilations of jurisdictions which have adopted these doctrines, Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 794–99 (1966); 2 Frumer & Friedman, Products Liability, § 16A [3] (1970 rev.). These jurisdictions include seven of the ten states in which plaintiffs' injuries occurred, three of the four states in which the manufacturers have their principal places of business, and the state of New York in which the trade association is located and in which the action has been brought.

 Strict liability concepts do not require the manufacturer to produce a product incapable of doing harm; the very utility of many products, such as knives and automobiles, presupposes characteristics which can inflict harm. A "defect" must "cause" the harm.

[A] plaintiff must trace his injury to a quality or condition of the product which was unreasonably dangerous either for a use to which the product would ordinarily be put, or for some special use which was brought to the attention of the defendant. These are the risks and losses which may fairly be regarded as typical of the enterprise and so fairly allocable to it. James, General Products—Should Manufacturers Be Liable Without Negligence? 24 Tenn.L.Rev. 923, 927 (1957) (citation omitted).

It is important to note that there is no sharp boundary between foreseeability—i. e., probability of harm—under negligence and under strict liability principles. On the contrary, there has been a continual interplay between the two doctrines. See, for an example of strict liability as influenced by foreseeability under negligence principles, Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 129–30 (9th Cir. 1968) citing Wright v. Carter Products, Inc., 244 F. 2d 53, 56, 58 (2d Cir. 1957); for the converse example see the broad concept of foreseeability adopted under negligence principles in Larsen v. General Motors Corp., 391 F.2d 495, 501–03 (8th Cir. 1968).

Reduction of the threshold probability required before a defendant-manufacturer can be held liable in either negligence or strict liability has resulted from the abandonment of rigid categorical judgments about what kinds of uses and users are foreseeable, and from an increased willingness to submit such issues to juries where the determination "depends on policy values underlying the 'common affairs of life.'" Passwaters v. General Motors Corp., 454 F.2d 1270, 1275 n. 5 at 1276 (8th Cir. 1972). See also Noel, Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93, 128 (1972).

In enterprise liability terms, what is important is "the foreseeability of the kinds of risks which the enterprise is likely to create" as distinguished from the negligence standard's focus on foreseeably unreasonable risks of specific conduct in particular circumstances. James, General Products—Should Manufacturers Be Liable Without Negligence?, 24 Tenn.L.Rev. 923, 925 (1957). Scope of possible liability is measured not by what "can and should reasonably be avoided" (though it may include such risks) but rather "the more or less inevitable toll of a lawful enterprise." 2 Harper & James, The Law of Torts § 26.7 at 1377 (1956). As in the areas of workmen's compensation and (in some jurisdictions) respondeat superior, the enterprise's liability extends to "the harm . . . typical for [the enterprise's] activities, and thus calculable and reasonably insurable." Ehrenzweig, Negligence Without Fault, 54 Calif.L. Rev. 1422, 1457 (1966).

Courts have used both "incentive" and "risk allocation" theories in applying strict liability. In a case holding a drug manufacturer liable for failure to warn users of the statistically small but qualitatively severe danger of a polio vaccine, the Ninth Circuit emphasized the fact of the manufacturer's actual knowledge of the risks involved. While the manufacturer was immune from liability during an initial period when "there was no known or foreseeable risk involved in taking [the drug]," "after further experience, the danger became apparent [and] a duty to warn attached." Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 129 (9th Cir. 1968). *See also* Basko v. Sterling Drug Co., Inc., 416 F.2d 417, 426 (2d Cir. 1969).

In cases where manufacturers have more experience, more information, and more control over the risky properties of their products than do drug manufacturers, courts have applied a broader concept of foreseeability which approaches the enterprise liability rationale. *See generally* Noel, Defective Products: Extension of Strict Liability to Bystanders, 38 Tenn.L.Rev. 1, 7–10 (1970) and cases cited therein.

A number of jurisdictions, including California, Texas, Indiana, New Jersey, Connecticut, Arizona, Michigan and New York have extended strict liability beyond its limitation in the Restatement to "users and consumers" (Rest.2d Torts § 402A and comment *o* on Caveat (1965)) to include third parties and "bystanders" injured by products such as automobiles, shotguns, and power lawnmowers. *See* Elmore v. American Motors Corp., 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969); Darryl v. Ford Motor Co., 440 S.W.2d 630 (Tex.1969); Sills v. Massey-Ferguson, Inc., 296 F. Supp. 776 (N.D.Ind.1969); Lamendola v. Mizell, 115 N.J.Super. 514, 280 A.2d 241 (1970); Mitchell v. Miller, 26 Conn.Super. 142, 214 A.2d 694 (1965); Caruth v. Mariani, 11 Ariz.App. 188, 463 P.2d 83 (1970); Piercefield v. Remington Arms, 375 Mich. 85, 133 N.W.2d 129 (1965); Codling v. Paglia, 38 A.D.2d

154, 327 N.Y.S.2d 978 (3d Dep't 1972). These courts reason that defects in, for example, automobiles pose a thoroughly foreseeable risk to other persons on or near the road, and that the policies underlying strict liability—control of the risk and spreading of loss—are applicable regardless of the "user or consumer" limitation. *See, e. g.,* Elmore v. American Motors Corp., 70 Cal.2d 578, 586, 75 Cal.Rptr. 652, 657, 451 P.2d 84, 88–89 (1969); *cf.* for discussion of enterprise liability and products other than automobiles: Sills v. Massey-Ferguson, Inc., 296 F.Supp. 776, 781 (N.D.Ind.1969) (power lawnmower); Klimas v. International Telephone and Telegraph Corp., 297 F.Supp. 937, 941–42 (D.R.I.1969) (electrical fuse).

As in the case of negligence, the greater the product's dangers when defects are present, the less the power of the court to preclude recovery by foreclosing a jury judgment of culpability. Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 129–30 (9th Cir. 1968). Similarly, where tampering by children is involved, negligence's tenderness towards youth is reflected in a reluctance to dismiss a strict liability claim. Thomas v. General Motors Corp., 13 Cal.App.3d 81, 91 Cal.Rptr. 301 (4th Dist. 1970).

If the standard of strict liability is found applicable to the absence of warnings on the caps, the range of intervening acts which will insulate the defendants from liability will be even narrower than under negligence principles. See Rest.2d Torts § 402A, comment *n* (1965); 2 Frumer & Friedman, Products Liability § 16A [5] [f]. However that range of intervening acts is defined under the laws of the various states, it will remain a jury question as to whether they occurred. *See* Sills v. Massey-Ferguson, Inc., 296 F.Supp. 776, 782 (N.D.Ind.1969).

### D. *Joint Liability*

The central question raised by defendants' motion is whether the de-

fendants can be held responsible as a group under any theory of joint liability for injuries arising out of their individual manufacture of blasting caps. Joint tort liability is not limited to a narrow set of relationships and circumstances. It has been imposed in a wide range of situations, requiring varying standards of care, in which defendants cooperate in various degrees, enter into business and property relationships, and undertake to supply goods for public consumption. Developments in negligence and strict tort liability have imposed extensive duties on manufacturers to guard against a broad spectrum of risks with regard to the general population. The reasoning underlying current policy justifies the extension of established doctrines of joint tort liability to the area of industry-wide cooperation in product manufacture and design.

#### (1) *The Elements of Joint Liability*

Joint liability has historically been imposed in four distinguishable kinds of situations:

(1) the actors knowingly join in the performance of the tortious act or acts; (2) the actors fail to perform a common duty owed to the plaintiff; (3) there is a special relationship between the parties (e. g., master and servant or joint entrepreneurs); (4) although there is no concerted action nevertheless the independent acts of several actors concur to produce indivisible harmful consequences. 1 Harper & James, The Law of Torts § 10.1 at 697–98 (1956).

*See also* Prosser, Joint Torts and Several Liability, 25 Calif.L.Rev. 413, 429 et seq. (1937).

These categories reflect three overlapping but distinguishable problems with which the law of joint liability has been concerned. The first is the problem of joint or group control of risk: the need to deter hazardous behavior by groups or multiple defendants as well as by individuals. The second is the problem of enterprise liability: the policy of assigning the foreseeable costs of an activity to those in the most strategic position to reduce them. The third is the problem of fairness with respect to burden of proof: the desire to avoid denying recovery to an innocent injured plaintiff because proof of causation may be within defendants' control or entirely unavailable. The complaint and defendants' motion to dismiss raise all three problems for consideration.

#### (2) *Joint Control of Risk*

The problem of joint control of risk was early posed in a case of group assault. In imposing joint liability, the court reasoned that ". . . [with] all coming to do an unlawful act, and of one party, the act of one is the act of all. . . ." *See* Sir John Heydon's Case, 11 Co.Rep. 5, 77 Eng.Rep. 1150 (1613), and other English cases cited in Prosser, Law of Torts § 46 at 291 (4th ed. 1971). Even in its earliest form the doctrine of joint liability for concerted action contained all the elements necessary for its future development: (1) causing harm (2) by cooperative or concerted activities (3) which violated a legal standard of care.

American courts have imposed joint liability for concerted action in cases involving a complex interaction of the three elements of the doctrine. "Cooperation" or "concert" has been found in various business and property relationships, group activities such as automobile racing, cooperative efforts in medical care or railroad work, and concurrent water pollution. "Express agreement is not necessary; all that is required is that there shall be a common design or understanding." Prosser, Joint Torts and Several Liability, 25 Cal.L.Rev. 413, 429–30 (1937).

The standard of care to which defendants have been jointly held has ranged from assault and reckless driving to negligence in building maintenance, brush burning, water pollution, and manufacture of explosives. *See, e. g.,* Simmons v. Everson, 124 N.Y. 319, 25 N.E. 911 (1891) (collapsed wall supported by interlocking walls); Prussak

v. Hutton, 30 App.Div. 66, 51 N.Y.S. 761 (3d Dep't 1898) (powder house used and maintained by several defendants); Troop v. Dew, 150 Ark. 560, 234 S.W. 992 (1921) (defendant contractors breaking fences allowing cattle to enter); Hanrahan v. Cochran, 12 App.Div. 91, 42 N.Y.S. 1031 (4th Dep't 1896) (racing horses); Bierczynski v. Rogers, Del., 239 A.2d 218 (1968) (racing cars); Sprinkle v. Lemley, 243 Or. 521, 414 P. 2d 797 (1966) (doctors treating same patient); Michigan Millers Mut. Fire Ins. Co. v. Oregon-Washington R. & Nav. Co., 32 Wash.2d 256, 201 P.2d 207 (1948) (railroads burning brush); Moses v. Town of Morgantown, 192 N.C. 102, 133 S.E. 421 (1926) (independent discharging of refuse into stream); Thompson v. Johnson, 180 F.2d 431 (5th Cir. 1950) (assault by several individuals); Dement v. Olin-Mathieson Chemical Corp., 282 F.2d 76 (5th Cir. 1960) (manufacturers of components).

■ These diverse cases impose joint liability on groups whose actions create unreasonable hazards of risks of harm, even though only one member of the group may have been the "direct" or physical cause of the injury. Where courts perceive a clear joint control of risk—typically the racing and assault cases, as well as those involving common duties or joint enterprise—the issue of who "caused" the injury is distinctly secondary to the fact that the group engaged in joint hazardous conduct.

This rationale was recognized in the nineteenth century. In a case involving a horse race in a crowded street, a New York court noted that the collision was "not willful or intentional on the part of the defendants," but it upheld a jury determination that the negligent racing of the defendants was the joint cause of injury. Hanrahan v. Cochran, 12 App. Div. 91, 94, 42 N.Y.S. 1031, 1032–33 (4th Dep't 1896). Imposing liability on the defendant not involved in the actual collision, the court stated that "these defendants were acting together and in concert in this race. It was the race that created the condition that resulted

in the accident." 12 App.Div. at 95, 42 N.Y.S. at 1033. By participating in a joint creation of negligent risk, both defendants were held liable for the consequences. See, for a modern application of this rule to automobile racing, Lemons v. Kelly, 239 Or. 354, 360–61, 397 P. 2d 784, 787 (1964), and Annot., 13 A.L. R.3d 431 (1967) (collecting cases). Analogous language focusing on the joint creation of risk can be found in the "common duty" cases, as when several defendants neglect to maintain a party wall. Simmons v. Everson, 124 N.Y. 319, 25 N.E. 911 (1891).

■ Joint control of risk can also arise through business relations or joint enterprise. Thus a New York court found that the owner and lessee of a powder magazine, as well as the purchaser of the powder, all "participated in the maintenance of the powder house" and hence were jointly liable for damages caused by explosion. Prussak v. Hutton, 30 App.Div. 66, 67, 51 N.Y.S. 761, 763 (3d Dep't 1898). See also Lindsay v. Acme Cement Plaster Co., 220 Mich. 367, 190 N.W. 275 (1922) (two defendants under a duty to keep track in repairs); Walton, Witten & Graham Co. v. Miller's Adm'x, 109 Va. 210, 63 S.E. 458 (1909) (employer and contractor both under duty to warn employee as to blasting); Troop v. Dew, 150 Ark. 560, 234 S.W. 992 (1921) (independent contractors both under duty to repair fences). The opinions frequently refer to the defendants' violations of a common duty of care not only in terms of joint control of risk, but also as concurrent causes which combine to produce injury. See, e. g., Walton, Witten & Graham Co. v. Miller's Adm'x, 109 Va. 210, 213–14, 63 S.E. 458, 460 (1909).

Defendants argue that their participation in the I.M.E. safety program, and their cooperative or parallel activities regarding the safety features of blasting caps do not give them joint control over the risks of injury for purposes of tort liability. Joint control of risk and consequent joint responsibility arises, in

their view, only when manufacturers enter into a conspiracy to commit intentional harm, or into a partnership or joint venture. The key to a joint venture, they assert, is an agreement to share profits and to pursue a limited number of business objectives over a short period of time. Since the defendants' membership in their trade association involves neither profit-sharing nor a limited time-span, they contend that no joint responsibility arises from the association and its members' activities.

The problem with this argument is that the elements of joint control of risk do not coincide with those in the formal doctrine of joint venture. The distinction was the basis for decision in Connor v. Great Western Savings & Loan Ass'n, 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968). The court found that a savings bank (Great Western) and a housing developer (Conejo) had, as a matter of practical economics,

> combined their property, skill, and knowledge to carry out the tract development, that each shared in the control of the development, that each anticipated receiving substantial profits therefrom, and that they cooperated with each other in the development. 69 Cal.2d 850, 863, 73 Cal.Rptr. 369, 375, 447 P.2d 609, 615

Despite this extensive cooperation and shared control of the venture the court found that

> there is no evidence of a community or joint interest in the undertaking. Great Western participated as a buyer and seller of land and lender of funds, and Conejo participated as a builder and seller of homes. Although the profits of each were dependent on the overall success of the development, neither was to share in the profits or the losses that the other might realize or suffer. *Id.*

Applying the rule that

> [A] joint venture exists when there is "an agreement between the parties under which they have . . . a joint interest, in a common business

undertaking, and understanding as to the sharing of profits and losses, and a right of joint control." *Id.* (citations omitted),

the court declined to hold the bank vicariously liable as a joint venturer for the negligence of the developer.

The court did find the bank liable for its own negligence in exercising what in practical effect was its joint control of the venture.

> In undertaking these relationships [with the developer] Great Western [the bank] became much more than a lender content to lend money at interest on the security of real property. It became an active participant in a home construction enterprise. It had the right to exercise extensive control of the enterprise. Its financing, which made the enterprise possible, took on ramifications beyond the domain of the usual money lender. 69 Cal.2d 850, 864, 73 Cal.Rptr. 369, 376, 447 P.2d 608, 616.

The bank, it held, should have realized that the thinly capitalized builder would be under great pressure to put up shoddy housing.

The lesson is clear that joint control of risk can exist among actors who are not bound in a profit-sharing joint venture. This point is thoroughly confirmed by cases imposing joint liability on "joint enterprises," which are distinguished from "joint ventures" as being "non profit undertaking[s] for the mutual benefit or pleasure of the parties" (Connor v. Great Western Savings & Loan Ass'n, 69 Cal.2d 850, 863–64 n. 6, 73 Cal.Rptr. 369, 376 n. 6, 447 P.2d 609, 616 n. 6 (1968)) and on which joint liability is imposed because of the parties' effective joint control of the risk. *See* Prosser, Law of Torts § 72 at 475–80 (4th ed. 1971).

Joint control may be shown in one of three ways. First, plaintiffs can prove the existence of an explicit agreement and joint action among the defendants with regard to warnings and other safety features—the classic "concert of ac-

tion." Second, plaintiffs can submit evidence of defendants' parallel behavior sufficient to support an inference of tacit agreement or cooperation. Such cooperation has the same effects as overt joint action, and is subject to joint liability for the same reasons. *Cf.* Prosser, Joint Torts and Several Liability, 25 Calif.L.Rev. 413, 430 (1937); Posner, Oligopoly and the Antitrust Laws: A Suggested Approach, 21 Stan.L.Rev. 1562, 1576–78 (1969).

■ Third, plaintiffs can submit evidence that defendants, acting independently, adhered to an industry-wide standard or custom with regard to the safety features of blasting caps. Regardless of whether such evidence is sufficient to support an inference of tacit agreement, it is still relevant to the question of joint control of risk. The dynamics of market competition frequently result in explicit or implicit safety standards, codes, and practices which are widely adhered to in an entire industry. *See, e. g.,* 1 Frumer & Friedman, Products Liability § 5.04 (1970 rev.). Where such standards or practices exist, the industry operates as a collective unit in the double sense of stabilizing the production costs of safety features and in establishing an industry-wide custom which influences, but does not conclusively determine, the applicable standard of care. *See* Prosser, Law of Torts § 33 at 166–68 (4th ed. 1971) (on relationship of industry custom to standard of care). As our decision in *Hall* below indicates, the existence of industry-wide standards or practices alone will not support, in all circumstances, the imposition of joint liability. But where, as here in *Chance,* individual defendant-manufacturers cannot be identified, the existence of industry-wide standards or practices could support a finding of joint control of risk and a shift of the burden of proving causation to the defendants. *See* discussion of Rest.2d Torts § 433B (1965) below.

In view of the allegations of explicit cooperation among members of the industry, it is apparent that plaintiffs have chosen the first of the above three alternative theories. We have set forth the other two lines of possible proof only to suggest the *a fortiori* position presented in the instant case.

■ There is thus no support for defendants' argument that to establish joint control of risk, plaintiffs must demonstrate that the explosives industry was "rigidly controlled" through the trade association with regard to blasting cap design, manufacture, and labeling, and that the object of such control was some particularly reprehensible breach of duty. The variety of business and property relationships in which joint control of risk has been found demonstrates the flexibility of the doctrine. Liability is not limited to particular formal modes of cooperation, nor to illegal or grossly negligent activities.

Two recent cases provide examples under both strict liability and negligence standards. In Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964), the applicable standard of care was strict liability; the duty of an automobile manufacturer was defined as having "its cars delivered to the ultimate purchaser free from dangerous defects" whether "negligently or nonnegligently caused." 61 Cal.2d 256, 261, 37 Cal.Rptr. 896, 899, 898, 391 P.2d 168, 171, 170. The court clearly perceived the manufacturer of the completed product as the strategic link in the complex chain of production and distribution and held that it could not delegate its duty backward to the manufacturers of component parts or forward to dealers and distributors.

For purposes of strict liability, the retail automobile distributor was also held to be "an integral part of the overall producing and marketing enterprise that should bear the costs of injuries resulting from defective products." 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 899, 391 P.2d 168, 171. This conclusion was based in part on the fact that

the retailer himself may play a substantial part in insuring that the

product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 899–900, 391 P.2d 168, 171–72.

Holding the retailer strictly liable was also justified on the grounds that "in some cases the retailer may be the only member of [the] enterprise reasonably available to the injured plaintiff." 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 899, 391 P.2d 148, 171. Joint liability "affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." 61 Cal.2d 256, 262–63, 37 Cal.Rptr. 896, 900, 391 P.2d 168, 172.

In the *Vandermark* case, the factors considered relevant to the issue of joint liability were (1) the standard of care —itself a function of the foreseeability and gravity of risk and the capacity of avoiding it—; (2) the participants' capabilities of promoting the requisite safety in the risk-creating process; (3) the need to protect the consumer, both in terms of ascertaining responsible parties and providing compensation; and (4) the participants' ability to adjust the costs of liability among themselves in a continuing business relationship.

The Fifth Circuit looked to similar considerations in a case involving the question of joint control of risk in the context of *res ipsa loquitur*. The plaintiff in Dement v. Olin-Mathieson Chemical Corp., 282 F.2d 76 (5th Cir. 1960), had been injured while working with an explosive charge containing three component parts. Evidence indicated that two of the components—the blasting cap and the dynamite—might have caused the accident. One of the defendant-manufacturers argued that the plaintiff was not entitled to the aid of *res ipsa,* since only one of the components had been under its exclusive control.

This "musical chairs argument" was rejected on the grounds it was not necessary that

> in order for res ipsa to apply one particular force must be severed out, identified and held as a matter of law to be the cause of the premature explosion. The various components were manufactured to be a part of one combination. . . . Even in cases in which there is no combination as there obviously is here, the Texas courts recognize joint liability against actors completely independent and unrelated to each other in circumstances where their conduct has caused indivisible injury which cannot be accurately apportioned and identified by the plaintiff. Dement v. Olin-Mathieson Chemical Corp., 282 F.2d 76, 82 (5th Cir. 1960) (citation omitted).

Like the Supreme Court of California in *Vandermark*, the Fifth Circuit emphasized the defendant-manufacturers' high duty of care to guard against defects in explosives, the defendants' control over the products at the critical stage when care was needed, the necessity of not imposing impenetrable procedural and burden of proof requirements on injured plaintiffs, and the possibility of cost-adjustment among the defendants. *See* 282 F.2d at 81, 82, 83, and 82 n. 3. *Cf.* Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687 (1944) (patient not required to show which doctor or nurse responsible for injury).

Plaintiffs' allegations in this case raise genuine issues under these criteria. As discussed in detail above, the allegation that defendants had actual knowledge of risks to children and of feasible safety measures provides a basis for finding an applicable duty of care under negligence and strict liability principles. Plaintiffs further allege that the defendant manufacturers obtained this knowledge through a jointly-sponsored trade association; the manufacturers delegated, in effect, at least some functions of safety investigation and design (such as labeling) to an industry-wide entity.

Whether defendants collected and shared this knowledge as a group, and made joint or cooperative decisions on the basis of the known risks, are critical issues which require full factual development.

Factors which must be explored to determine both the existence of joint control of risk and appropriate remedies (if any) include the size and composition of the trade association's membership, its announced and actual objectives in the field of safety, its internal procedures of decision-making on this issue, the nature of its information-gathering system with regard to accidents, the safety program and its implementation by the association and member manufacturers, and any other activities by the association and its members (such as legislative lobbying) with regard to safety during the time period in question. *See generally* Developments in the Law—Judicial Control of Private Associations, 76 Harv.L.Rev. 983, 994–998, 1037–1055, 1080–1095 (1963).

### (3) *Enterprise Liability*

Joint liability has been traditionally imposed on multiple defendants who exercise actual collective control over a particular risk-creating product or activity. In a related but distinguishable fashion, joint or vicarious liability has been imposed on the most strategically placed participants in a risk-creating process, even though injuries are caused "directly" or partially by other participants under their general supervision. *See* 2 Harper & James, The Law of Torts, ch. 26, esp. at 1361–69, 1375–78 (1956) and Supplement (1968). As Judge Cardozo noted in a workmen's compensation case involving injury to one employee by another's carelessness:

> The risks of injury incurred in the crowded contacts of the factory through the acts of fellow workmen are not measured by the tendency of such acts to serve the master's business. Many things that have no such tendency are done by workmen every day. The test of liability under the statute is not the master's dereliction, whether his own or that of his representatives acting within the scope of their authority. The test of liability is the relation of the service to the injury, of the employment to the risk. Leonbruno v. Champlain Silk Mills, 229 N.Y. 470, 473, 128 N.E. 711, 712 (1920).

A similar principle of enterprise liability is embedded in the doctrine of respondeat superior—an employer's vicarious liability to third parties for employees' wrongs committed "in the scope of their employment." Rest. 2d Agency § 219(1) (1958). In the pure vicarious liability case, an employer is not charged himself with violating a standard of care—such as failing to properly supervise the inspection or labeling of a product. Rather, the employer is held liable because, despite reasonable precautions, his employee has violated the applicable standard of care. *See* Rest. 2d Agency §§ 219(1), 228, 229 (1958); 2 Harper & James, The Law of Torts, ch. 26 at 1361–63, 1368–69, 1372–74, 1390 (1956). The employer may be held liable even though the employee's acts (or failure to act) were forbidden or intentionally wrongful. Rest. 2d Agency § 230 (forbidden acts); § 231 (consciously criminal or tortious acts); § 232 (failure to act); *cf.* Roberts v. Gagnon, 1 A.D.2d 297, 300, 149 N.Y.S.2d 743, 747 (3d Dep't 1956).

The rationale for an employer's vicarious liability to third parties has been analyzed as being very close to the enterprise liability basis of workmen's compensation. In both types of cases

> [w]e are not . . . looking for the master's fault but rather for risks that may fairly be regarded as typical of or broadly incidental to the enterprise he has undertaken. . . . [O]ne of the purposes for such a quest is to mark out in a broad way the extent of tort liability (as a cost item) that it is fair and expedient to require people to expect when they engage in such an enterprise, so there can be some reasonable basis for calculating this cost. . . . What is

reasonably foreseeable in this context, however, is quite a different thing from the foreseeably unreasonable risk of harm that spells negligence. In the first place, we are no longer dealing with specific conduct but with the broad scope of a whole enterprise. Further, we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise. The foresight that should impel the prudent man to take precautions is not the same measure as that by which he should perceive the harm likely to flow from his long-run activity in spite of all reasonable precautions on his own part. The proper test here bears far more resemblance to that which limits liability for workmen's compensation than to the test for negligence. The employer should be held to expect risks, to the public also, which arise "out of and in the course of" his employment of labor. 2 Harper & James, The Law of Torts, § 26.7 at 1376–78 (1956) (citations omitted).

*See also* Calebresi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 449, 543 (1961).

Enterprise liability is also apparent in the long line of cases imposing joint and vicarious liability on owners, employers and manufacturers for breach of "non-delegable duties", or for miscarriage of "inherently dangerous activities" by their contractors, employees, and distributors. *See* Prosser, Law of Torts § 71 at 470–74 (4th ed. 1971) (collecting cases).

A review of the cases demonstrates that the range of non-delegable duties is very broad; Dean Prosser suggests that the only unifying criterion is "the conclusion of the courts that the responsibility is so important to the community that the employer [—in the broad sense of one who utilizes the services of another—] should not be permitted to transfer it to another." Prosser, Law of Torts § 71 at 471 (4th ed. 1971). The list of "inherently dangerous activities"

is also long, running from classic categories such as the keeping of vicious animals or blasting to any activity "in which there is a high degree of risk in relation to the particular surroundings" and which thus requires definite or special precautions. Prosser, *supra*, at 73; *see* Rest. 2d Torts §§ 416, 427 (1965); Rest. 2d Agency § 214, comment *c* (1958).

This body of precedent, whether couched in the language of non-delegable duty or inherently dangerous activity or both, is addressed essentially to the problem of when it is justifiable for an owner, employer, or manufacturer to rely on the services of another to guard against known or foreseeable risks. *See, e. g.,* Besner v. Central Trust Co., 230 N.Y. 357, 362–63, 130 N.E. 577, 578–79 (1921). The factors which must be considered in deciding whether such reliance is justifiable include

the competence and reliability of the person upon whom reliance is placed, his understanding of the situation, the seriousness of the danger and the number of persons likely to be affected, the length of time elapsed, and above all the likelihood that proper care will not be used, and the ease with which the actor himself may take precautions. Prosser, Law of Torts § 33 at 177 (4th ed. 1971) (citations omitted).

In many instances the most strategic point of foresight, precaution and risk distribution may be the individual manufacturer, supplier, or employer. In other situations—typically water or air pollution by multiple emitters—the only feasible method of ascertaining risks, imposing safeguards and spreading costs is through joint liability or other methods of joint risk control. *See, e. g.,* Moses v. Town of Morgantown, 192 N.C. 102, 133 S.E. 421 (1926); Tackaberry Co. v. Sioux City Service Co., 154 Iowa 358, 378, 132 N.W. 945, 952–53 (1911) (Weaver, J. dissenting); *cf.* Katz, The Function of Tort Liability in Technology Assessment, 38

U.Cinn.L.Rev. 587, 616–20 (1969); Rheingold, Civil Cause of Action for Lung Damage Due to Pollution of Urban Atmosphere, 33 Brooklyn Law Rev. 17, 31–32 (1966). The point is not only that the damage is caused by multiple actors, but that the sole feasible way of anticipating costs or damages and devising practical remedies is to consider the activities of a group. We do not, of course, suggest that private actions are the best way to meet these problems but only that in the absence of preemptive legislation, tort principles will support a remedy. *Cf.* Connecticut Action Now, Inc. v. Roberts Plating Company, Inc., 457 F.2d 81 (2d Cir. 1972); Michelman, Pollution as a Tort: A Non-Accidental Perspective on Calabresi's *Costs*, 80 Yale L.J. 647 (1971); Roberts, River Basin Authorities: A National Solution to Water Pollution, 83 Harv.L.Rev. 1527, 1540–1556 (1970); Calabresi and Melamed, Property Rules, Liability Rules, and Inalienability: One View of the Cathedral, 85 Harv.L.Rev. 1089, 1108–1110 (1972).

The allegations in this case suggest that the entire blasting cap industry and its trade association provide the logical locus at which precautions should be taken and liability imposed. It is unlikely that individual manufacturers would collect information about the nation-wide incidence and circumstances of blasting-cap accidents involving children, and it is entirely reasonable that the manufacturers should delegate this function to a jointly-sponsored and jointly-financed association.

In the event that the evidence warrants it, the imposition of joint liability on the trade association and its members should in no way be interpreted as "punishment" for the establishment of industry-wide institutions. Such liability would represent rather the law's traditional function of reviewing the risk and cost decisions inherent in industry-wide safety practices, whether organized or unorganized. *See, e. g.,* The T. J. Hooper, 60 F.2d 737 (2d Cir. 1932).

To establish that the explosives industry should be held jointly liable on enterprise liability grounds, plaintiffs, pursuant to their pleading, will have to demonstrate defendants' joint awareness of the risks at issue in this case and their joint capacity to reduce or affect those risks. By noting these requirements we wish to emphasize their special applicability to industries composed of a small number of units. What would be fair and feasible with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of thousands of small producers.

### (4) *Causation and Burden of Proof*

Plaintiffs contend that they should be relieved of the usual burden of proving a causal connection between each of their injuries and a particular manufacturer. Their problem is that a blasting cap found and exploded by a child often destroys what will be the only reliable evidence of its manufacturer—markings on the casing. As a solution they invoke Section 433B of the Second Restatement of Torts, which provides in pertinent part:

(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Subsection (2) is based primarily on cases in which water pollution has been caused by independent actors. Its applicability depends on an initial showing by the plaintiff that each defendant has

done something—not necessarily simultaneously—to cause the damage although it cannot be demonstrated "that any one defendant was responsible for the entire injury or any specified part of it." 1 Harper & James, The Law of Torts § 10.1 at 708 (1956). Courts have held that where the injury "cannot be apportioned with reasonable certainty among the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages. . . . " Landers v. East Texas Salt Water Disposal Co., 151 Tex. 251, 256, 248 S.W.2d 731, 734 (1952); *see also* cases cited in 1 Harper & James, *supra,* § 10.1 at 706–09.

In the instant case plaintiffs have alleged that defendants' conduct combined to cause injury at the point of the labeling and designing of the caps. The rule embodied in section 433B(2) of the Second Restatement of Torts, shifting the burden of apportionment to the defendants, is applicable only as a corollary principle of proof to plaintiffs' main theories that defendants engaged in concerted action, or operated as a joint enterprise, with respect to the labeling and design of the caps.

Subsection (3) of Section 433B shifts the burden of proving causation to independently-acting defendants. It arises not from the problem of combined causation but rather from alternative causation of injury. The best known example is Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948), in which a hunter's injury could have been caused by only one of his two independently negligent companions. The reason for shifting the burden of proving causation, as with the burden of proving apportionment, is

> the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm. Rest.2d Torts § 433B, comment *f* (1965).

*See also* Wigmore, Joint Tortfeasors and Severance of Damages: Making the Innocent Party Suffer Without Redress, 17 Ill.L.Rev. 458 (1923).

Plaintiffs must first demonstrate that defendants breached a duty of care as to them. *See* Summers v. Tice, 33 Cal.2d 80, 85–86, 199 P.2d 1, 4 (1948); Rest.2d Torts § 433B, comment *g* (1965). We have already concluded that plaintiffs may be able to demonstrate such a breach.

Second, plaintiffs must establish some causal connection between the group-created risk and their injuries—"that the harm has resulted from the conduct of some one" of the tortious actors. Rest. 2d Torts § 433B, comment *g* (1965). Defendants argue that the complaint fails to allege this connection between the named defendants and the injuries because it concedes that the caps may have been made by other, unnamed manufacturers. In their supporting papers defendants raise the possibility that the caps involved in the accidents may have come from Canadian or other foreign manufacturers or from domestic firms no longer in business and not named in the complaint. Defendants' Reply Memorandum, Sept. 2, 1971, at p. 4; Defendants' Reply Memorandum, Dec. 24, 1970, at p. 12.

 The possibility—admitted by plaintiffs—that the caps may have come from other, unnamed sources, does not affect plaintiffs' burden of proof. Plaintiffs must show by a preponderance of the evidence—i. e., that it is more probable than not—that the caps involved in the accidents were the products of the named defendant-manufacturers. Plaintiffs do not have to identify which one of the defendant-manufacturers made each injury-causing cap. To impose such a requirement would obviate the entire rule of shifting the burden of proving causation to the defendants. It must be more probable than not that an injury was caused by a cap made by some one of the named defendant manufacturers, though which one is unknown. *See, e. g.,* Ball, The Moment

of Truth: Probability Theory and Standards of Proof, 14 Vand.L.Rev. 807 (1961); Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329, 1341 n. 37 (1971); J. M. Maguire et al., Cases and Materials on Evidence, 547–550 (5th ed. 1965); citations in Rosado v. Wyman, 322 F.Supp. 1173 (E.D.N.Y.1970).

 Defendants argue further that the requisite causal connection between the unknown member or members of the group and the injuries cannot be established because the defendants' conduct was not in "close physical and chronological connection to the injurious results." Defendants' Surrebuttal Memorandum at p. 10. While the hunting cases involve such conduct, a sufficient causal connection has been found in other circumstances involving more complex interaction between multiple defendants and injury. See Saint Pierre v. McCarthy [1957] Que.Rep. 421 (merchants selling cartridges to boys). The key requirement thus far imposed in the cases has been that the risk-creating conduct be "simultaneous in time, or substantially so, and [be] . . . of substantially the same character, creating substantially the same risk of harm, on the part of each actor." Rest.2d Torts § 433B, comment h (1965). The required chronological nexus, in other words, is not between defendants' conduct and injury, but among the conduct of the several defendants. Plaintiffs' allegations satisfy these criteria.

If plaintiffs can establish by a preponderance of the evidence that the injury-causing caps were the product of some unknown one of the named defendants, that each named defendant breached a duty of care owed to plaintiffs and that these breaches were substantially concurrent in time and of a similar nature, they will be entitled to a shift of the burden of proof on the issue of causation.

### E. Joinder, Transfer and Conflict of Laws

 To justify permissive joinder of parties plaintiffs must show both a "common question of law or fact" and a right to relief "arising out of the same transaction or occurrence or series of transactions or occurrences." Fed.R. Civ.P. 20(a). Defendants move for severance of plaintiffs on the ground that the complaint fails to satisfy either requirement, and for dismissal or transfer of the claims thus severed. 28 U.S.C. § 1404(a). They assert that the substantive law of the ten states will govern liability, and hence the claims present no common question of law.

 The question of which state's law will govern which aspects of this case cannot be settled by assertion. In diversity cases, a federal court is bound to apply the choice-of-law principles of the state in which it sits. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, the choice of applicable law in personal injury cases is not determined by the traditional "place of injury" test, but by "the flexible principle that the law to be applied to resolve a particular issue is 'the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern' with the matter in issue and 'the strongest interest' in its resolution." Long v. Pan American World Airways, 16 N.Y. 2d 337, 341, 266 N.Y.S.2d 513, 515, 213 N.E.2d 796, 798 (1965), quoting Babcock v. Jackson, 12 N.Y.2d 473, 481, 484, 240 N.Y.S.2d 743, 749, 751, 191 N.E.2d 279, 282, 285 (1963) (Fuld, J.). Cf. Reese, Products Liability and Choice of Law: The United States Proposals to the Hague Conference, 25 Vand.L.Rev. 29, 31–32, 37–38 (1972); Leflar, The Torts Provisions of The Restatement (Second) of Conflict of Laws, 72 Colum.L.Rev. 267, 270–71, 276–77 (1972).

 The locus of defendants' joint activity was allegedly at least in part in New York, the location of the I.M.E. Whether proof of this connection would be sufficient to support the application of New York law to some or all of the claims is a complex question involving consideration of New York choice-of-law principles and federal constitutional law.

The parties are directed to supply briefs on this issue and on the general question of the law applicable to the different aspects of this case. Prior to a full consideration of the choice-of-law question, this court cannot rule on whether the plaintiffs' claims contain a common question of law. It should be noted, however, that Rule 20(a) requires only *"any* common question of law or fact." Thus the presence of questions of law not common to all the plaintiffs will not, in itself, defeat joinder. *See* Music Merchants v. Capitol Records, 20 F.R.D. 462 (E.D.N.Y.1957); 7 Wright & Miller, Federal Practice and Procedure § 1653 at 274 (1972).

Plaintiffs' claims do contain, moreover, common questions of fact—for example, whether the defendants exercised joint control over the labeling of blasting caps and operated, for purposes of tort liability, as a joint enterprise with respect to such labeling. The presence of these questions satisfies the requirement of Rule 20(a) that "any question of law *or* fact common to all these persons" arise in the action.

■■■ Defendants also contend that because the accidents occurred at different times and places, plaintiffs' rights to relief do not arise out of the same transaction or occurrence, or series of transactions or occurrences. There is no rigid rule as to what constitutes "the same transaction or occurrence" for purposes of joinder under Rule 20(a). "[T]he approach must be the general one of whether there are enough ultimate factual concurrences that it would be fair to the parties to require them to defend jointly" against the several claims. Eastern Fireproofing Co., Inc. v. United States Gypsum Co., 160 F.Supp. 580, 581 (D.Mass.1958). Application of this flexible standard presents a certain challenge in this case. It would be neither fair nor convenient to any of the parties nor to the court to determine in this court all the relevant issues of fact involved in each accident. At the same time it would be unfair and burdensome to require each plaintiff to prove the al-

leged joint activities in ten separate and (to that extent) repetitive actions.

The solution does not lie in wholesale severance, and the cases cited by defendants do not support that result. *See, e. g.,* Kenvin v. Newburger, Loeb & Co., 37 F.R.D. 473 (S.D.N.Y.1965), distinguishable from this case on the grounds that here, plaintiffs' right to relief arises to a significant (but not complete) extent on alleged joint activity which constitutes a single "transaction or occurrence." Rather, fairness to the parties may be maximized by permitting plaintiffs to litigate the issues of joint activity in this court, and then transferring the questions which turn on the particular facts of each accident to the federal districts in which the accidents occurred. *See* 28 U.S.C. § 1404(a), Rules 20(b) and 42(a) and (b), Federal Rules of Civil Procedure. Whether this procedure would entail full separate trials of different issues, or special findings of fact in this court, or other possible procedures, will be decided after consideration of the choice-of-law problem and in consultation with the parties.

## II. THE HALL CASE

### A. *Facts and Proceedings*

In Hall v. Du Pont, plaintiffs' first complaint was filed in 1969. In its original form, the complaint presented 230 claims on behalf of forty-three plaintiffs against fifteen defendants, comprising almost all American manufacturers of blasting caps and their trade association, the I.M.E.

The original *Hall* complaint, like the present complaint in *Chance*, did not link the plaintiffs' injuries to the products of particular manufacturers. Rather, the complaint alleged that virtually the entire blasting cap industry had cooperated with regard to certain safety features of its product, particularly with regard to warning labels. The results of this cooperation, according to the complaint, were inadequate safety provisions which in turn caused plaintiffs' injuries.

Two sets of legal theories were relied upon to support joint liability and federal jurisdiction. The first was grounded in federal anti-trust law: the defendants were said to have conspired to eliminate competition in the field of safety, in violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq. A second set of claims was based on state law—including negligence, common law conspiracy, assault, and strict liability in tort —and was brought within federal jurisdiction by pendant jurisdiction and diversity of citizenship, 28 U.S.C. § 1332. The Sherman Act claims were dismissed because of the expiration of the applicable statute of limitations and plaintiffs were granted leave to amend. Hall v. Du Pont, 312 F.Supp. 358 (E.D.N.Y. 1970).

An amended complaint was filed. The plaintiffs in the *Hall* case now comprise the children of three families and their parents: the Halls, citizens of New York; the Balls, citizens of Ohio; and the Brieses, citizens of North Dakota. Each of the plaintiff-children claims damages against two manufacturers of blasting caps, Du Pont and Hercules, both citizens of Delaware, on grounds of negligence, common law conspiracy, assault, and strict liability in tort. Claims are also made by the parents of these children for loss of services and medical expenses. The sole basis of federal jurisdiction is diversity of citizenship.

I.M.E., an unincorporated New York association, was also named as a defendant. On plaintiffs' motion I.M.E. was dropped as a defendant to retain diversity jurisdiction. Fed.R.Civ. P. 21.

The new pleading resembles the original in most of its factual allegations. Each of three groups of children is said to have "come into possession" of a dynamite blasting cap which was not labeled or marked with a warning of danger, and which could be easily detonated by a child. In each instance an injurious explosion occurred.

One significant detail with regard to each injury is added in the amended complaint: the name of a particular manufacturer. In the case of the Hall children, the accident which occurred on April 17, 1956, in Suffolk County, New York, involved a cap "manufactured, labeled, and designed," according to the complaint, by Hercules. A cap similarly alleged to have been produced by Hercules is said to have been responsible for the injuries sustained by the Briese children in Bismarck, North Dakota, on July 31, 1956. The Ball child was allegedly injured in Caton, Ohio, on April 23, 1961, by a cap produced by Du Pont.

While the amended complaint links each injury to the product of a particular manufacturer, it also seeks to preserve the joint liability approach of the earlier pleading. The plaintiffs press their claims against "all defendants"; the Halls, for example, seek relief not only against Hercules, which allegedly produced the cap involved in the New York accident, but against Du Pont as well.

Defendants responded to the amended complaint with several motions attacking the legal sufficiency of certain claims, the timeliness of the parents' claims, the joinder of the parties, and the appropriateness of the forum. While this court recognized that defendants' motions might have merit, they were denied pending discovery. *See* Memorandum and Order, Hall v. Du Pont, 69–C–273, February 16, 1971. After an extensive discovery period defendants' motions have been renewed.

B. *Joint Liability*

The central question raised by defendants' motions is whether the amended complaint presents a claim of joint liability against the manufacturers. We hold that the amended complaint in *Hall* does not preserve the joint liability aspects of the case.

After dismissal of the I.M.E. as a defendant on plaintiffs' motion, the defendants numbered only two manufacturers—Du Pont and Hercules—out of a larger group of active producers. The basis of selection of these two defendants is clear. Du Pont and Hercules

happen to be the only two manufacturers whom three groups of plaintiffs can identify as the producers of injury-causing caps. Plaintiffs' assertion that Du Pont and Hercules "will fairly and adequately protect the interests of the unincorporated association and its members" is not sufficient to overcome the arbitrary method by which these two firms were selected by plaintiffs to defend against a claim of industry-wide responsibility.

■■ A plaintiff is not required to implead all joint tort-feasors as indispensible parties. *See* Lawlor v. National Screen Service Corp., 349 U.S. 322, 330, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955); Bigelow v. Old Dominion Copper Mining & Smelting Co., 225 U.S. 111, 132, 32 S.Ct. 641, 644, 56 L.Ed. 1009 (1912). Moreover, the courts will normally honor the plaintiff's choice of theory and the Federal Rules of Civil Procedure recognize his right to plead more than one claim or the same claim supported by different theories alternatively, hypothetically and even inconsistently. Fed.R.Civ.P. 8(a), (e) (2). Yet, there are limits on the plaintiff's choice. One consideration is that some remedies and theories pose substantially more difficult problems of administration than others. Another is the degree of avoidable cost and expense placed on the defendant.

The problem is most clearly posed in class actions where foreseeable burdens are so great that the court can exercise discretion to compel plaintiffs to use a less onerous alternative. *See* Fed.R. Civ.P. 23(b) (3); Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). Thus, for example, in explaining Rule 23(b) (3) requiring a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy" the draftsmen of the Rule noted:

another method of handling the litigious situation may be available which has greater practical advantages . . . the court with the aid of the

parties ought to assess the relative advantages of alternative procedures for handling the total controversy." 3B Moore's Federal Practice, ¶ 23.01 [10.-3].

■ A "novel or boundary line" principle (Patterson, The Scope of Restitution and Unjust Enrichment, 1 Mo.L. Rev. 223, 231 (1936)), particularly where it requires courts and litigants to assume heavy burdens, need not be extended to situations where traditional remedies are perfectly satisfactory. In this respect the *Hall* case—where the manufacturer of the cap in question is known—is quite different from *Chance* —where it is not. It is true that the doctrine of adequacy and the exercise of judicial discretion denying alternative remedies is most often associated with specific performance. 2 Restatement of the Law of Contracts § 358 (1932). But we hardly need remind ourselves that equity and law have been merged in the federal courts; the principles of one need not be ignored in administering the other. *Cf.* Fed.R.Civ.P. 2 (one form of action); Ross v. Bernhard, 396 U.S. 531, 539–542, 90 S.Ct. 733, 738–740, 24 L.Ed.2d 729 (1970).

Plaintiffs, by joining defendants, rely upon equitable antecedents. *See, e.g.*, references to Equity Rules and practice in the Committee Notes to Rules 19, 20 and 21 of the Federal Rules of Civil Procedure in 3A Moore's Federal Practice ¶¶ 19.01[3], 19.01[5–2], 20.01[2], 21.01[2]; 1 Harper & James, The Law of Torts, § 10.1 at 695–697 (1956). The hoary principle that he who seeks equity must do equity applies. McClintock, Handbook of Principles of Equity, 22 (2d ed.1948). Plaintiff will not be permitted to burden the court and defendants by an unnecessary and inappropriate joinder of a party having no real interest in the suit. McClintock, Handbook of Principles of Equity, 22 (2d ed.1948); 3A Moore's Federal Practice ¶ 20.08. *Cf.* Dorsey v. Community Stores Corporation, 52 F.R. D. 13 (E.D.Wis.1971).

We do not justify this position on the ground that we "feel free to fashion an

independent law of remedies in equitable actions." Wright, Handbook of the Law of Federal Courts, 242 (2d ed.1970). *See also* Zunamon v. Brown, 418 F.2d 883, 888–889 (8th Cir.1969). Rather, it is an exercise of our procedural power to "secure the just, speedy, and inexpensive determination" of this action. Fed.R. Civ.P. 1.

No appropriate benefit to plaintiff is suggested by joining with the defendant who manufactured the damaging blasting cap another manufacturer of similar caps. Neither law nor equity encourages people to be "churlish about their rights." Lord Bowen quoted in Behrens v. Richards, [1905] 2 Ch. 614, Chaffee & Re, Equity, 893 (5th ed.1967). In fact, as we have already noted, the redundant naming of an additional manufacturer results from the happenstance of joinder of claims by unrelated plaintiffs; a manufacturer whose cap was known to have caused the damage to any one plaintiff named in the complaint was carried over into the claims of another plaintiff for typographical rather than legal reasons.

The claims by the Halls and the Brieses against Du Pont and the claims by the Balls against Hercules must be dismissed.

## C. *Appropriate Forum*

■ With each plaintiff now having claims only against the manufacturer of the injury-causing cap, defendants' motion for severance under Rule 20(a) of the Federal Rules of Civil Procedure must be granted. While evidence of joint action or responsibility may well be relevant in the claims against each manufacturer, proof of such responsibility will not be necessary for recovery on each plaintiff's claims. Recovery in each case will turn on the legal-factual questions of negligence and strict liability, and on evidence about the circumstances of the separate accidents. The claims by the three groups of plaintiffs present sufficiently diverse questions of law and fact to require severance.

■ This brings us to defendants' final contention, that the claims arising in North Dakota against Hercules and in Ohio against Du Pont should be dismissed as inappropriate to a New York forum, or alternatively, transferred to federal courts in North Dakota and Ohio. Section 1404(a) of title 28 of the United States Code provides that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Arguing for dismissal rather than transfer, defendants contend that the doctrine of *forum non conveniens* is "substantive" law and binding on a federal court in a diversity case under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Faced with a tort suit between nonresidents based on a tortious act outside New York, a New York state court would have only the remedy of dismissal. *See, e.g.,* Jones v. United States Lines, Inc., 36 A. D.2d 601, 318 N.Y.S.2d 557 (1st Dep't 1971). Defendants' contention is that where a New York state court would dismiss on the grounds of inappropriate forum, a federal court sitting in New York must do likewise.

■ Defendants' position has no support in prior cases or in the policy objectives of federal practice. Putting aside the question of whether New York practice would apply to the North Dakota and Ohio actions and whether New York courts would condition a dismissal on a defendant's agreement to submit to another jurisdiction, state law and remedies are not controlling. Federal courts, unlike state courts, have both the power and responsibility to coordinate and switch cases on a national scale in aid of the more efficient administration of justice. *See* 28 U.S.C. § 1404(a); Thompson v. Palmieri, 355 F.2d 64, 66 (2d Cir.1966). *Cf.* Parsons v. Chesapeake & Ohio R. Co., 375 U.S. 71, 84 S.Ct. 185, 11 L.Ed.2d 137 (1963) (holding that prior dismissal of complaint by state

court on basis of state doctrine of *forum non conveniens* does not divest federal court of discretionary power to rule on motion for transfer under 28 U.S.C. § 1404(a)). In any event, there is no inconsistency between the transfer policy of section 1404(a) and New York's *forum non conveniens* doctrine.

The relevant factors are well known. In terms of the private interests of the litigants, they include relative ease of access to proof, availability of witnesses (including compulsory process) and "all other practical problems which make trial of a case easy, expeditious, and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055, 1062 (1947). The public interest in fairness and judicial administration is of at least equal importance and involves such considerations as familiarity with applicable local law, and avoidance of having litigation "piled up in congested centers instead of being handled at its origin." Gulf Oil Corp. v. Gilbert, *supra*, 330 U.S. at 508–509, 67 S.Ct. at 843. *See also* Parsons v. Chesapeake & Ohio R. Co., 375 U.S. 71, 73–74, 84 S.Ct. 185, 197, 1 L.Ed.2d 137 (1963).

In the North Dakota and Ohio cases, local questions of fact and law will predominate. Transfer under 28 U.S.C. § 1404(a) is particularly appropriate because it secures the advantages of forums in which the accidents occurred while preserving the discovery already obtained in this court.

The claims of Dennis and Daryl Briese and their father, George Briese, against Hercules must be transferred to the United States District Court, District of North Dakota. The claims of Christopher Ball and his father, Harley Ball, against Du Pont must be transferred to the United States District Court, Northern District of Ohio. The claims of Philip and Douglas Hall and their father, Lloyd Hall, against Hercules, based on an accident which occurred in this district, remain in this court.

**D. *Parents' Claims for Loss of Services and Medical Expenses***

Defendants have moved to dismiss the claims by the parent-plaintiffs for loss of services and medical expenses on the grounds that they are barred by the applicable statutes of limitations. Since the claims arising in North Dakota and Ohio will be transferred to their respective federal districts, the statute of limitations question should be decided in those forums. The motions in this court to dismiss the parents' claims in the Briese and Ball cases are accordingly denied without prejudice.

The claim by Lloyd Hall, father of Philip and Douglas Hall, against Hercules, arises out of an accident which occurred in Suffolk County, New York, on April 17, 1956. In diversity cases, this court is bound to apply the New York statute of limitations. *See* Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

Under New York law, actions to recover damages for personal injury must be commenced within three years of the occurrence of the injury. CPLR 214; Golia v. Health Ins. Plan of Greater New York, 6 A.D.2d 884, 177 N.Y.S.2d 550 (2d Dep't 1958), aff'd, 7 N.Y.2d 931, 197 N.Y.S.2d 735, 165 N.E.2d 578 (1960). For purposes of determining the applicable statute of limitations, a parent's action for a child's medical expenses is considered an action for "personal injury." Bailey v. Boat, 178 Misc. 870, 36 N.Y.S.2d 465 (Sup.Ct. Tioga Co. 1942); Ballantine v. Ahearn, 170 Misc. 651, 10 N.Y.S.2d 937 (Sup.Ct. Kings Co.1939). While CPLR 208 provides for tolling of the statute of limitations during infancy, neither this section nor its predecessor, section 60 of the Civil Practice Act, tolls the statute for the parent's claims. Kratz v. Dussault, 33 A.D.2d 826, 305 N.Y.S.2d 734 (3d Dep't 1969); Francies v. County of Westchester, 3 A.D.2d 850, 161 N.Y.S.2d 501 (2d Dep't 1958).

No circumstances of a special nature militate against the application' of the New York statute in this case. Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80 (2d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed. 26 (1961). Defendant Hercules' motion to dismiss Lloyd Hall's claim for medical expenses is accordingly granted.

## III. CONCLUSION AS TO CHANCE AND HALL CASES

### A. *Chance v. Du Pont*

In Chance v. Du Pont, 70–C–1107, plaintiffs cannot identify the particular manufacturers of the injury-causing caps. They have joined substantially the entire blasting cap industry and its trade association as defendants, and their recovery turns on theories of joint liability.

Plaintiffs' allegations of joint knowledge and action raise issues of fact and law sufficient to defeat dismissal, and to require full consideration of the choice-of-law issues in the case. Defendants' motion to dismiss the plaintiff-children's claims is denied, and the parties are directed to submit briefs on the law applicable to the issues in the case. Decision on defendants' motion to dismiss the parents' claims for medical expenses on statute of limitations grounds is reserved pending decision on the law applicable to that issue.

Defendants' motions for severance and transfer are denied. They may be renewed after consideration of the choice-of-law issues and appropriate procedures for trying the issues in the case.

The complaint sounds in assault (counts 3, 7, 11, 15, 19, 23, 28, 32, 36, 40, 44, 48 and 52) as well as in strict liability and negligence but no allegations to show intent are incorporated. On the basis of the argument to date, it seems unlikely that this theory is seriously urged. The assault claims are dismissed.

Separate claims are also made for conspiracy (counts 2, 6, 10, 14, 18, 22, 27, 31, 35, 39, 43, 47 and 51). But, as already pointed out, the conspiracy allegations merely support the negligence and strict liability theories as evidence of joint activity. They supply no separate basis for recovery and are dismissed.

An amended complaint need not be filed.

### B. *Hall v. Du Pont*

In Hall v. Du Pont, 69–C–273, three groups of plaintiffs brought claims against two manufacturers of blasting caps. In each instance one of the two manufacturers was identified as the producer of the injury-causing cap; the other was joined on a theory of industry-wide responsibility for certain features of the cap's design.

The arbitrary basis of plaintiffs' selection of the non-producer defendants, and the absence of any demonstrable need for joint liability in administrative or remedial terms, requires dismissal of each plaintiff's claims against the non-producer defendants. The remaining claims against the individual manufacturers present sufficiently diverse questions of law and fact to defeat joinder under Rule 20(a) of the Federal Rules of Civil Procedure. The severed claims arising in Ohio and North Dakota are transferred to their respective federal districts.

The children's claims arising in this district remain in this court. The parent's claim for loss of services and medical expenses is dismissed under the applicable statute of limitations.

So ordered.